THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JORGE REVELO, Defendant-Appellant.

Second District    No. 2—95—1263

Opinion filed December 30, 1996.

Larry D. Drury, of Larry D. Drury, Ltd., and Ronald D. Haze, both of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HUTCHINSON delivered the opinion of the court:

Defendant, Jorge Revelo, appeals from the trial court's orders denying his various post-trial motions. Defendant was charged by indictment with three counts of aggravated criminal sexual assault.

See 720 ILCS 5/12—13(a)(1), 12—14(a)(2) (West 1994). Following a jury trial, defendant was found not guilty on counts I and III of aggravated criminal sexual assault; he was found guilty on count II (placing his mouth on the complainant's vagina). The trial court sentenced defendant to a seven-year term of imprisonment.

On appeal, defendant contends: (1) he was denied his right to a public trial because the trial court excluded the members of his family from the courtroom during the testimony of the complainant, A.S.; (2) his conviction was supported by insufficient evidence that he used force against A.S. or that A.S. suffered bodily harm; (3) the trial court abused its discretion in denying defendant's motion to suppress a statement he made after the police told him a test had revealed the presence of his sperm within A.S.'s vagina, where the police had not yet obtained the test results; and (4) the trial court erred by preventing defense counsel from introducing evidence that the interrogating police officer obtained two signed statements from defendant before informing him of the charges against him. We reverse and remand.

Defendant and A.S. had known one another since their childhood in Mundelein, Illinois. Although the two were never romantically involved, they were friends. Similarly, A.S.'s and defendant's families were friendly and often socialized together. After A.S.'s family moved to Round Lake, Illinois, she and defendant saw each other less frequently. A.S. was 16 years old in December 1994.

On December 17, 1994, defendant, A.S., her friend Melissa McGowan, and two of defendant's friends went out for the evening. A.S. testified that before leaving McGowan took an "over-the-counter cold remedy" called Nyquil. The plan for the evening was to attend what A.S. described as a "quinceanera, a cotillion." By the time the five youths arrived, the quinceanera was over. Eventually the group decided to eat at an all-night restaurant. According to A.S., they ordered shakes and shared a "basket of fries and barbecued chicken wings." After eating, the group left the restaurant. It was approximately 12:30 a.m. on December 18, 1994.

Because of the hour, defendant offered to allow McGowan and A.S. to spend the night at his parents' home. A.S. and McGowan were to sleep in the basement living room on a "pull-out" sleeper sofa. A.S. and McGowan accepted the offer. Defendant's friends dropped off A.S., McGowan, and defendant. The three sat in the living room and started watching a movie.

Defendant, A.S., and McGowan drank alcoholic beverages. A.S. stated defendant asked if she would like something to drink. However, defendant testified that A.S. volunteered, "Man, I want to get smashed." According to defendant, McGowan initially stated she

did not wish to drink. Defendant and A.S. went upstairs to the kitchen. A.S. testified that while in the kitchen defendant asked her if she had ever cheated on her boyfriend, Chuck. Defendant attempted to kiss A.S. A.S. stated that she pushed defendant away and he relented. Defendant testified he and A.S. each drank three shots of whiskey; A.S. stated she drank two half shots. Upon returning downstairs, the two learned McGowan had changed her mind and now wished to have a drink. The three returned to the kitchen and McGowan drank three shots of whiskey. Defendant testified he and A.S. had "at least one more shot each"; A.S. stated that defendant alone had another shot of whiskey. Once downstairs, A.S. asked for and received a pair of defendant's shorts to wear. After putting on the shorts, A.S. and McGowan went to sleep on the sleeper sofa.

At this point, the accounts of defendant and A.S. diverge; we relate A.S.'s testimony first. A.S. was lying between defendant and McGowan. A.S. stated she awoke to find defendant rubbing her hands. A.S. testified she did not give him permission to do so. A.S. pulled her hand away, turned away from defendant, and "scooted over by" the sleeping McGowan. A.S. testified that defendant then "started to put his hands up my shorts." He then began rubbing A.S.'s vagina. A.S. testified she did not give defendant permission to do so and "told him to stop." A.S. tried to push defendant away. In response, defendant put his finger inside A.S.'s vagina. Again, A.S. testified she had not given him permission to do so. A.S. stated defendant's action "hurt." She placed her foot on defendant's hand and tried, albeit unsuccessfully, to push his arm down. A.S. stated she told defendant to stop "[t]hree or four times."

Defendant then stopped, stood up, and kneeled by the sleeper sofa. A.S. testified that as defendant stood up she "scooted up by [McGowan's] head." A.S. stated she tried to wake McGowan by calling her by name and "pushing her in the head." McGowan did not awaken.

While attempting to wake McGowan, A.S. felt defendant grab her by the ankles and pull her towards him. As defendant pulled, A.S. fell backwards, striking her head on a pole forming part of the frame of the sleeper sofa. A.S. testified that as defendant tried to pull down her shorts and undergarment she attempted to pull them up. Moving A.S.'s hands away, defendant removed her shorts and undergarment. A.S. was lying on her back. Grabbing her ankles again, defendant pushed A.S.'s legs forward. Her knees came to rest on either side of her head. Defendant pinned A.S. on the sleeper sofa by placing his shoulders against the back of A.S.'s knees and holding her legs. A.S. testified that being placed in this position hurt. Al-

though she pushed against defendant's head, forehead, and shoulders, A.S. could not free herself. Defendant inserted his tongue into A.S.'s vagina. A.S. testified she did not give him permission to do so.

After defendant released her, A.S. again attempted to wake McGowan. A.S. testified that she "started poking [McGowan] and moving her." McGowan raised her head. A.S. shook McGowan. McGowan's eyes appeared "glassy and she looked like she wasn't there." After a "couple of seconds," McGowan's head fell back onto the pillow. A.S. was crying.

A.S. also testified defendant penetrated her vagina with his penis. However, defendant was found not guilty of the count of aggravated criminal sexual assault premised on this allegation. Hence, we need not set forth this testimony in detail. We do note A.S. testified that when defendant finally stopped he stated, " 'Oh my God, what am I doing?' "

Defendant's remembrance differed sharply. He testified that as he was lying on the sleeper sofa he accidently touched A.S.'s leg. He started rubbing her leg and back. According to defendant, he and A.S. held hands for approximately two or three minutes and "just basically looked at each other." Defendant reached inside A.S.'s shorts with his hand. He testified A.S. did not respond in any way during this period of time.

Defendant began rubbing A.S.'s vagina. He testified that "she was like moaning. *** She said, 'No, I can't because of Chuck.' " In response to A.S.'s statement, defendant ceased rubbing A.S.

According to defendant, A.S. initiated further contact. He testified she placed her left leg on top of his right leg. Defendant resumed rubbing A.S.'s left leg and, eventually, her vagina. He stated A.S. began "moaning" again. Defendant testified A.S. repeated that " 'I can't because of Chuck.' " Defendant continued. He removed A.S.'s shorts and underwear and performed oral sex on A.S. Defendant stated A.S. moaned throughout but said nothing.

Afterwards, according to both A.S. and defendant, A.S. retreated into a corner of the basement living room and started to cry. McGowan awoke. She went to A.S.'s side. With McGowan's assistance, A.S. dressed in the downstairs rest room. A short time later, defendant drove McGowan and A.S. to Chuck's home. A.S. testified that both before and during the drive to her boyfriend's home defendant repeatedly apologized to her; defendant remembered making a single apology.

Defendant's brother, Rafael Revelo, testified that he returned home at approximately 4 a.m. on December 18, 1994. Rafael Revelo stated he observed defendant, McGowan, and A.S. lying on the sleeper sofa. Rafael believed the three were asleep.

Several witnesses testified to events occurring in A.S.'s home on the evening of December 18, 1994. On that evening defendant—accompanied by two of his brothers, Gerardo Revelo and Carlos Revelo, along with their father, Alfredo Revelo—visited A.S.'s home. A.S. testified defendant stated "he just touched me." A.S. then accused defendant of being a liar. She testified they both started to cry and A.S. left the room. Alfredo Revelo testified that defendant stated he did not touch A.S. On cross-examination, the father testified he asked defendant if he had penetrated A.S. and that defendant had replied, "no." Gerardo Revelo testified that during the meeting at A.S.'s home "[i]t was dead silence." He testified defendant "didn't say anything. He just sat there."

A.S. was examined by Carol Newman, M.D., on the morning of December 19, 1994. Doctor Newman testified that she discovered the back of A.S.'s head was tender to the touch. The tender area corresponded to the portion of A.S.'s head that struck the frame of the sleeper sofa. A form prepared by the doctor indicated A.S.'s vagina had been penetrated with a penis; it also stated there had been no digital or "oral copulation of genitals."

Tamara Burr, a registered nurse, assisted during Doctor Newman's examination. Nurse Burr testified that the back of A.S.'s head was red. The nurse also testified that she did not ask A.S. any questions about oral sex. However, on cross-examination, Nurse Burr stated she did ask A.S. whether there had been "any oral or rectal penetration." A.S. answered, " 'no.' " On redirect, the nurse revealed that A.S.'s mother had been present when A.S. denied the occurrence of oral penetration. A.S. retracted her denial after her mother left the examining room.

A.S. described herself as being 5 feet 1 inch tall and weighing between 98 and 103 pounds. She also stated defendant is taller and heavier than she.

On January 13, 1995, Detective Richard Chiarello of the Round Lake Beach police department questioned defendant in an interview room at the police department. Chiarello testified he had a warrant issued for defendant's arrest. Chiarello visited defendant's home and asked defendant to come to the police station and answer some questions. Defendant agreed. Chiarello opined that defendant "was very calm and cooperative." The detective testified defendant was not served with the arrest warrant until after he made the written statements.

Defendant and Chiarello remembered the commencement of the interview differently. The detective testified he began the interview by reading defendant the *Miranda* warnings (see *Miranda v. Arizona,*

384 U.S. 436, 467-74, 16 L. Ed. 2d 694, 719-23, 86 S. Ct. 1602, 1624-28 (1966)) from a "preprinted form." After reading defendant the warnings, Chiarello asked defendant, " '[h]aving these rights in mind, do you wish to speak with me?' " According to Chiarello, defendant responded that he would. Conversely, defendant testified Chiarello's first action upon entering the interview room was to ask, " 'You know why you're here, don't you?' " " 'Yes, I think so,' " defendant replied. Following some conversation establishing that defendant knew A.S., defendant was handed a document entitled "*Miranda* Warnings." (Emphasis added.) Defendant testified he did not recall at what point in time he first saw the document. According to defendant, Chiarello read this document out loud. Again, according to defendant, Chiarello instructed defendant to sign the document. Defendant signed the document.

Chiarello testified to the circumstances surrounding the interview. He stated defendant never said he did not wish to speak to the detective. Defendant never asked to speak to an attorney. Chiarello stated he made no promises to defendant. The detective testified he neither forced nor coerced defendant in any way. Chiarello stated he never raised his voice to defendant. According to the detective, defendant was calm, cooperative, and comfortable during the interview. However, Chiarello stated defendant began to cry after giving his first written statement.

Defendant also related the circumstances of the interview. He stated he was nervous, scared, and his legs were shaking. Defendant testified he "had no idea what to do." He stated he was in the interview room 15 minutes before saying anything concerning the events of December 18, 1994. After defendant spoke with Chiarello for approximately 30 to 45 minutes, the detective asked defendant to make a written statement. He agreed. As defendant composed the first statement, Chiarello left to get defendant lunch.

Chiarello attempted to obtain a second written statement. Defendant completed his first written statement. Chiarello left the interview room to read the statement. In the statement, defendant admitted only to putting his finger in A.S.'s vagina. Chiarello returned. In alluding to the results of a sexual assault kit that had been performed on A.S., the detective stated, " 'Why would it be that your semen would be found in [A.S.'s] vagina if you only put your finger in her vagina?' " Defendant largely corroborated Chiarello's testimony on this point. Defendant testified the detective told him "a rape kit was done on [A.S.] *** and he said, 'Why would it say—that your semen was in the vaginal swab of [A.S.]?' " Both defendant and Chiarello agree that the detective asked defendant to give a second

written statement in light of the inconsistencies between the "results" of the sexual assault kit and the first statement.

Chiarello admitted that, when he commented on the possible presence of defendant's semen in A.S.'s vagina, the detective did not know the results of the sexual assault kit. A hospital laboratory report revealed that A.S.'s genital culture contained no trichomonads (*i.e.*, flagellated protozoans) and, *a fortiori*, no sperm.

Defendant gave a second written statement. In this statement he admitted "touch[ing] [A.S's] vagina with my mouth." Defendant also stated A.S. repeatedly said "no" and asked him to stop. Defendant did not believe he penetrated A.S.'s vagina; he did admit to placing his penis on top of her vagina.

Before trial, defendant filed a document setting forth his potential witnesses. The document listed, *inter alia*, defendant's father and his brothers Rolando, "Jerry" (whose given name is Gerardo), and Carlos.

Prior to A.S.'s trial testimony, the State moved to exclude all persons other than defendant, his counsel, and a victim counselor. Defense counsel immediately objected. He argued that defendant's mother, father, and brothers had a direct interest in the cause. Therefore, defense counsel asserted, they could not be excluded. See 725 ILCS Ann. 5/115—11 (Smith-Hurd Supp. 1996) (stating that parties who, in the trial court's opinion, have a direct interest may not be excluded when a minor victim of a sexual crime testifies). The trial court granted the State's motion. The media were permitted to remain. However, the court failed to find expressly whether defendant's mother, father, and brothers possessed a direct interest in the cause.

■ Defendant's first contention is that he was denied his right to a public trial because the trial court excluded the members of his family from the courtroom during the testimony of A.S. The Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/100—1 *et seq.* (West 1994)) addresses a trial court's authority to close a criminal trial during a minor complainant's testimony. Section 115—11 of the Code provides that "where the alleged victim of the offense is a minor under 18 years of age, the court may exclude from the proceedings while the victim is testifying, all persons, who, in the opinion of the court, do not have a direct interest in the case, *except the media.*" (Emphasis added.) 725 ILCS Ann. 5/115—11 (Smith-Hurd Supp. 1996). The threshold question raised by the present case is whether a section 115—11 closure must comport with both the section itself as well as the United States Supreme Court's limitations on the closing of judicial proceedings. See, *e.g.*, *Waller v. Georgia*, 467 U.S. 39, 81 L. Ed. 2d 31, 104 S. Ct. 2210 (1984).

The Illinois Supreme Court recently held that a trial judge acting pursuant to section 115—11 need only satisfy the requirements of the section. *People v. Falaster*, 173 Ill. 2d 220, 228 (1996). The court interpreted the phrase "except the media" as requiring a court acting pursuant to the section to permit the media to attend the victim's testimony. Because the media was "allowed full and uninhibited access to the proceedings[,] *** none of the evils of closed trials [were] implicated in the present case." *Falaster*, 173 Ill. 2d at 228. We note that the trial court in *Falaster* "did not impose *any* restrictions on the media." (Emphasis added.) *Falaster*, 173 Ill. 2d at 228. Therefore, if a trial court excludes the media—or, indeed, if any nontraditional restrictions are placed on the media's ability to report on a criminal proceeding—section 115—11 is insufficient to sanction the trial court's ruling; in such a situation, courts must comply with the limitations enunciated by the United States Supreme Court.

We turn then to the requirements of section 115—11. First, notwithstanding the trial court's opinion, the media and its representatives must be permitted to attend, document, and report the proceeding. Second, section 115—11 permits a trial court to exclude all persons determined by the court to lack a direct interest in the outcome of the proceeding. Thus, "those persons who *do* have a direct interest in the case, such as a defendant's immediate family, may not be excluded." (Emphasis in original.) *People v. Benson*, 251 Ill. App. 3d 144, 149 (1993). In *Benson*, the court stated a trial court acting pursuant to section 115—11 may "properly exclude *** only those spectators whose connection to the case on trial is tenuous or whose presence simply reflects their curiosity about the *** proceedings." (Emphasis omitted.) *Benson*, 251 Ill. App. 3d at 149. We adopt this definition. To *Benson* we add the following: a spectator whose curiosity is based on the nature of the proceedings themselves likely has no direct interest; however, a direct interest is more likely to exist if a spectator's interest is predicated on a relationship with the defendant predating the commencement of the proceedings.

■ In the present case, the trial court failed to follow the requirements of section 115—11. As in *Falaster*, the media were permitted to attend fully. Therefore, no danger of a closed trial existed. However, the trial court failed to make an express finding concerning the interest of defendant's parents and siblings. Under the facts established by this record, it would be Orwellian to describe as tenuous the connection between these parents or these siblings and the criminal trial of the defendant. We will not do so. Additionally, defendant's parents and siblings were not "simply curious" because of the nature of the criminal trial; they were present out of an inter-

est—and likely a concern—for defendant that long predated the beginning of this cause. To the extent the trial court's ruling excluding defendant's parents and siblings can be interpreted as an implicit finding that they did not have a direct interest in defendant's trial, we hold this to be an abuse of discretion. See *People v. Garrett*, 264 Ill. App. 3d 1089, 1094 (1994).

Notwithstanding any error in the application of section 115—11, the trial court had the inherent authority to exclude defendant's father, Alfredo Revelo, and his brothers, Gerardo, Rafael, and Carlos Revelo. It is well settled that a trial court, acting within its discretion, may grant a motion to exclude witnesses from the courtroom. *People v. Taylor*, 244 Ill. App. 3d 460, 467 (1993), citing *People v. Scott*, 38 Ill. 2d 302, 306 (1967); see also *In re C.P.*, 141 Ill. App. 3d 1018, 1022 (1986). A trial court does not impinge upon a defendant's right to a public trial when exercising this long-recognized power. *People v. Jenkins*, 10 Ill. App. 3d 588, 590 (1973).

We hold that the trial court could have properly excluded Alfredo, Gerardo, Rafael, and Carlos Revelo for the purpose of preserving the integrity of the judicial process. Alfredo, Gerardo, and Carlos Revelo, along with A.S., all witnessed and potentially could have testified to the events that occurred in A.S.'s home on the evening of December 18, 1994; additionally, Rafael Revelo testified that he observed defendant asleep on the sleeper sofa with McGowan and A.S. Consequently, it was appropriate for the trial court to exclude these four members of defendant's immediate family who were present during events at issue in the proceeding. See *People v. Byer*, 75 Ill. App. 3d 658, 668-69 (1979) (stating purpose of exclusion "is to allow the trier of fact to compare individual and independent accounts of the facts of the case"); *People v. Boles*, 52 Ill. App. 3d 707, 709 (1977) (stating purpose of rule is to prevent witnesses from tailoring their testimony to previously introduced evidence); see also 75 Am. Jur. 2d *Trials* § 241 (1991). Although the trial court did not rely on its inherent authority to exclude witnesses, this is an appropriate ground on which to affirm the portion of the court's order excluding Alfredo, Gerardo, Rafael, and Carlos Revelo. See *Messenger v. Edgar*, 157 Ill. 2d 162, 177 (1993); *Pavey Envelope & Tag Corp. v. Diamond Envelope Corp.*, 271 Ill. App. 3d 808, 816 (1995) (stating that trial court's ruling may be affirmed on any basis supported by record beyond grounds asserted by trial court, even if asserted grounds were erroneous).

Our opinion should not be read as an avenue to exclude directly interested immediate family members in all section 115—11 situations. On the contrary, our decision applies only to situations in

which members of a defendant's immediate family and the complainant both observe or take part in the same events bearing on the disposition of the cause. Absent this fact, the trial court could not have excluded Alfredo, Gerardo, Rafael, or Carlos Revelo pursuant to section 115—11.

Indeed, the boundaries of our section 115—11 holding were reached and violated in the present case. Neither defendant's mother nor his other siblings, Lucy Maria Revelo or Rolando Revelo, took part in or testified to events bearing on the disposition of this cause. Therefore, the court's inherent authority to exclude witnesses did not justify the exclusion of defendant's remaining immediate family. Under section 115—11, but not the United States or Illinois Constitution (see *Falaster*, 173 Ill. 2d at 227 (accepting proposition that media serve as a proxy for the public, and, therefore, constitutional right to a public trial is preserved if media are allowed to attend)), defendant's remaining immediate family members have the right to attend A.S.'s testimony (see *Garrett*, 264 Ill. App. 3d at 1093-94; *Benson*, 251 Ill. App. 3d at 149). We find that this is the clear and unequivocal intent of section 115—11. Having already held it would be an abuse of discretion to find that defendant's parents and siblings lacked a direct interest in the proceedings against defendant, we turn to the question of prejudice.

We hold that a defendant need not prove specific prejudice when a trial court excludes persons with a direct interest in the proceeding. As a practical matter, it is hard to envision what would constitute prejudice in the wake of a section 115—11 violation. It would be difficult, if not impossible, to require a defendant to prove, or the State to disprove, prejudice. However, if section 115—11 is to confer anything beyond a meaningless right without a remedy, defendants must conclusively be presumed to be prejudiced by a section 115—11 violation. We so hold. This holding is bolstered by the practice of presuming prejudice when the constitutional guarantee of a public trial is violated. *E.g.*, *People v. Willis*, 274 Ill. App. 3d 551, 554 (1995); *Taylor*, 244 Ill. App. 3d at 468. We see no reason why a different practice should apply under section 115—11.

Our opinion does not confer on defendant's mother, Lucy Maria, or Rolando an absolute right to be present during A.S.'s testimony. On remand, the members of defendant's immediate family who did not take part in or testify to events bearing on the disposition of this cause may only be excluded during A.S.'s testimony if the trial court expressly finds there is a significant likelihood that such family members would relate the substance or tone of A.S.'s testimony to those members of the Revelo family who could be called as witnesses.

The trial court must support such a finding with definite and articulable reasons why defendant's mother, Lucy Maria, or Rolando are more likely than any other immediate family member to act as a conduit between A.S.'s testimony and the other members of the Revelo family. *Cf. C.P.*, 141 Ill. App. 3d at 1022 (because it is within the discretion of a trial court to instruct witnesses not to communicate their completed testimony to other witnesses waiting to be called, it necessarily follows that similar restrictions or even exclusion of third parties is appropriate where the trial court reasonably believes that they will improperly communicate testimony to witnesses waiting to be called). Simply because defendant's mother, Lucy Maria, and Rolando are closely related to defendant is insufficient. The existence of this type of relationship is the *raison d'être* for the right conferred by section 115—11. Therefore, it would be absurd for the nature of the relationship to be the basis for denying the right.

For the foregoing reasons, the judgment of the circuit court of Lake County is reversed, and the cause is remanded.

Reversed and remanded.

McLAREN, P.J., and DOYLE, J., concur.