2023 IL App (1st) 181070

No. 1-18-1070

Filed June 29, 2023

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 16555 |
| | ) | |
| MATTHEW SMITH, | ) | Honorable |
| | ) | Michele Pitman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, Matthew Smith was convicted of first degree murder for the 2012 shooting death of Kevin Guice outside of a nightclub in Harvey, Illinois, and was sentenced to 30 years in prison. In his appeal, he argues that (1) his right to a public trial was violated when his mother was excluded from the courtroom, (2) evidence of lineup identifications should have been suppressed since lineups were unduly suggestive, (3) the State elicited improper testimony on

gunshot residue testing, (4) closing statements were prejudicial, and (5) a photograph provided to the jurors during deliberation deprived him of a fair trial. We reverse and remand for a new trial.[1]

¶ 2                                    I. BACKGROUND

¶ 3         Prior to jury selection, the trial court ruled on pending motions *in limine*. Both the State and defense moved for witnesses to be barred from the courtroom while they were not testifying. Defense counsel indicated that Smith's mother, Trae[2] Smith, was present and requested that she be permitted to remain in the courtroom throughout the proceedings. Counsel acknowledged that Trae Smith was included on the State's witness list, but explained:

> "She was at the police station with Matthew when he asserted his right to counsel, which the police respected. So there is no issue at issue in this case. As far as I can tell, that is the start and finish of her involvement in the case itself."

¶ 4         The State opposed the defense's request. The court excused Smith's mother from the courtroom while the matter was argued. The State informed the court that Smith's mother was a possible witness but stated it would be unlikely that the State would call her to testify. The assistant state's attorney (ASA) explained that Smith's mother was present at a police station while he was questioned and, since Smith was a juvenile at the time, his mother was permitted to accompany him during questioning. The ASA further explained that an electronic recording (ERI) of Smith's interview depicts an interaction between Smith and his mother before he decided whether to speak with police officers. The ASA continued:

> "[T]here was some interaction on that ERI between the mother and the defendant and the police officer. It's not just a clear, like, [']no, I don't want to talk.['] * * *

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] The record gives various spellings of Ms. Smith's first name. We adopt the spelling used in defendant's brief.

* * *

*** [T]here was some interaction between the defendant and his mother as to what should be done, should [he] talk to the police, should [he] not talk to the police. It's unlikely that she would be called by the State even if the defendant testifies, but there is a potential that, yes, if the defendant said something different that what's on that ERI, we may call the mother to testify to impeach the defendant as to the circumstances of what was happening at the police department during that questioning."

This was the only circumstance in which the State anticipated possibly calling Trae Smith to testify.

¶ 5 Defense counsel countered that Smith's mother should be permitted to remain in the courtroom since the State was unlikely to call her and Smith's entire interview, including the interaction with his mother, was video recorded. Counsel further indicated that Smith was 16 years old at the time of the offense, his mother was very interested in his trial, and she had attended most of his prior court appearances.

¶ 6 The court ruled that since Smith's mother was present for his questioning, she was a possible witness and, for that reason, would be excluded from the courtroom. The court instructed the State, however, to inform the court once it decided that it would not call Smith's mother so she could return to the courtroom.

¶ 7 The record indicates that Smith's mother was excluded from the courtroom during jury selection, opening statements, and the State's case-in-chief. She was permitted in the courtroom only after Smith informed the court that he would not testify.

¶ 8 At trial, the State presented evidence establishing that Guice was killed by a gunshot to the left side of his head. Several witnesses testified that they had attended a party at the Press Box, a

bar in Harvey, on the night of August 10, 2012. From the DJ booth, Guice asked those present to recognize a moment of silence to honor someone who had recently died. Music stopped playing and the Press Box became quiet. Moments later, someone shouted, "f*** [them], play the music!" A large fight then broke out. A security guard deployed pepper spray, prompting many patrons to exit. Three witnesses testified that they observed Smith—who they described as having a Mohawk hairstyle and wearing a red and white shirt—produce a silver revolver and fire shots at Guice in the parking lot. One witness testified that Smith was the person who shouted the obscenity that interrupted the moment of silence. These same four witnesses identified Smith in a lineup the next day and again in court at trial.

¶ 9    Two Harvey police officers testified that they responded in their respective squad cars to a dispatch about the fight at the Press Box. Upon arrival, both observed bystanders point toward a silver Buick, which quickly sped away from the parking lot. Both officers pursued the Buick until it jumped a curb and stopped near a gas station. Smith ran from the front passenger seat and was quickly apprehended. Smith was wearing a white undershirt when arrested. A silver .357 Magnum revolver and a red and white shirt were recovered from the floor of the silver Buick. At trial, a police officer identified the shirt as the one recovered from the silver Buick, and an eyewitness to the shooting identified it as the same shirt that they observed Smith wearing.

¶ 10    The jury found Smith guilty of first degree murder and made special findings that Smith was armed with a firearm and personally discharged a firearm.

¶ 11    In a motion for new trial, Smith claimed, among other issues, that his mother's exclusion violated his right to a public trial. In responding to this claim, the State indicated that Smith invoked his right to counsel when he was interviewed at the police station. Defense counsel asserted:

"[I]t's disingenuous to say that [the State] needed to call Matthew Smith's mother for any purpose even if Matthew Smith had taken the stand and said that some things that happened at the police station didn't happen. They would not have to call his mom. *** [T]hey would have had to have admitted the ERI into evidence."

¶ 12 The court denied Smith's motion for new trial. On this issue, the court stated:

"Concerning the defendant's mother, I do agree. The defendant's mother - - the Court would certainly allow her to remain in the courtroom. This is a public trial. However, she was a witness to the defendant's statements. Therefore, she possibly could be a witness. I can't say that the State would not have called her.

If I had heard that there was no basis to call the mother, the Court would have absolutely allowed the mother to remain in the courtroom. However, hearing that she was present when the defendant was questioned by the police, they absolutely made her a witness to the statements that Mr. Smith gave to the police. When I heard from defense counsel that the defendant would not be testifying, the Court immediately indicated that the mother could remain in the courtroom, and she was allowed to remain in the courtroom."

¶ 13 The court sentenced Smith to a term of 30 years' imprisonment but declined to apply a discretionary firearm enhancement based on the jury's special findings. Smith filed a timely notice of appeal.

¶ 14 II. ANALYSIS

¶ 15 A. Right to a Public Trial

¶ 16 We first address Smith's claim that his right to a public trial was violated when his mother was excluded from the courtroom.

¶ 17        The State argues that Smith forfeited this issue by failing to object on the express basis of his public trial right. Instead, the State contends, Smith only objected on the basis that it was unlikely that Smith's mother would be called to testify. We are unpersuaded that Smith forfeited this claim. When initially objecting, defense counsel did not use the words "public trial." The issue was necessarily implied, however, and the substance of counsel's arguments pertained to whether an overriding interest justified Trae Smith's exclusion—the standard applicable to warrant a courtroom closure over a defendant's right to a public trial. See *People v. Radford*, 2020 IL 123975, ¶ 27. Further, the court's treatment of the issue evinces that it understood Smith's right to a public trial was implicated. The court found, however, that Trae Smith's potential as a witness was reason to exclude her but limited her exclusion to such time as she remained a potential witness. When the issue was raised in a motion for new trial, Smith's right to a public trial was explicitly asserted.

¶ 18        We recognize that a defendant can forfeit review of their right to a public trial by failing to object. "Th[e] need to lodge a contemporaneous objection to a courtroom closure *** prevents a defendant from potentially remaining silent about a possible error and waiting to raise the issue, seeking automatic reversal only if the case does not conclude in his favor." *Id.* ¶ 37. Additionally, "if there is no objection at trial, there is no opportunity for the judge to develop an alternative plan to a partial closure or to explain in greater detail the justification for it." *Id.* But these concerns are not present here. The record refutes that Smith purposefully remained silent so he could retain an issue for appeal in case he lost. To the contrary, defense counsel prompted argument on the issue. In addition, the court explained its ruling and made a plan that the court believed best accommodated the interests at stake. Ultimately, to preserve an issue for appeal, a defendant must object at trial and raise the issue in a posttrial motion. *People v. Galarza*, 2023 IL 127678, ¶ 45.

The record reveals that Smith did both. Accordingly, we find that he did not forfeit this issue, and we will address his claim without resorting to plain error analysis. See *id.* (forfeited claims may only be reviewed for plain error).

¶ 19      The sixth amendment to the United States Constitution guarantees the accused the right to a public trial and trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials. *Radford*, 2020 IL 123975, ¶ 25. The right to a public trial acts both " 'as a safeguard against any attempt to employ the courts as instruments of persecution' " and as " 'an effective restraint on possible abuse of judicial power.' " *People v. Goods*, 2016 IL App (1st) 140511, ¶ 61 (quoting *In re Oliver*, 333 U.S. 257, 270 (1948)). It aims to (1) ensure fairness of the trial, (2) remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) encourage witnesses to come forward, and (4) discourage perjury. *Radford*, 2020 IL 123975, ¶ 25 (citing *Waller v. Georgia*, 467 U.S. 39, 46 (1984)). To further these interests, all criminal trials are presumed to be open to the public. *People v. Taylor*, 244 Ill. App. 3d 460, 468 (1993). That presumption is not absolute, however, and may yield to an overriding interest that is specifically articulated. *Id.* (citing *People v. Holveck*, 141 Ill. 2d 84, 100 (1990)). Any closure, over the objection of the accused, is permissible if (1) the party seeking the closure advances an overriding interest that is likely to be prejudiced, (2) the closure is no broader than necessary to protect that interest, (3) the trial court considers reasonable alternatives, and (4) the court makes findings adequate to support the closure (*Waller* test). *Radford*, 2020 IL 123975, ¶ 27 (citing *Waller*, 467 U.S. at 47-48). This test applies at any stage of a criminal trial (*id.* (citing *Presley v. Georgia*, 558 U.S 209, 214 (2010))) and must be satisfied for even a partial closure of the courtroom. *Taylor*, 244 Ill. App. 3d at 466. The exclusion of a single person can constitute a partial closure. See *People v. Evans*, 2016 IL App (1st) 142190, ¶ 1 (finding that murder

defendant's right to a public trial was violated when his step-grandmother was excluded from the courtroom during jury selection because of the room's small size).

¶ 20    The State argues that we should not examine Trae Smith's exclusion as an alleged deprivation of the right to a public trial, but simply determine whether the circuit court abused its discretion in exercising the well-established power to exclude witnesses from the courtroom.

¶ 21    To be sure, a trial court generally does not impinge upon a defendant's right to a public trial when it excludes witnesses from the courtroom. *People v. Revelo*, 286 Ill. App. 3d 258, 266 (1996). This long-recognized power "prevent[s] witnesses from tailoring their testimony to previously introduced evidence" and "allow[s] the trier of fact to compare individual and independent accounts of the facts of the case." (Internal quotation marks omitted.) *Id.* A trial court's decision to exclude witnesses is reviewed for an abuse of discretion. *In re M.W.*, 2013 IL App (1st) 103334, ¶ 23.

¶ 22    Smith's contention, though, is that Trae Smith should not have been treated as a potential witness, as it was highly improbable that the State would call her to testify. And by excluding her, the State violated his right to a public trial. We agree that this issue does not merely concern a decision on whether to exclude witnesses, but whether Trae Smith was properly deemed one to justify her exclusion. Viewing the issue this way, it implicates Smith's right to a public trial. In general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15. When the issue involves questions of both law and fact, we will not disturb a trial court's findings of fact unless against the manifest weight of the evidence, but we review the court's application of the facts to the law and ultimate determination *de novo*. *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 22; see *State v. Ndina*, 2009 WI 21, ¶ 45, 315 Wis. 2d 653, 761 N.W.2d 612 ("the issue whether the Sixth Amendment

right to a public trial was violated presents the application of constitutional principles to historical facts").

¶ 23    In our view, the interests underlying the exclusion of witnesses provided only a facially valid reason for excluding Smith's mother. A facially valid reason alone is insufficient. See *Taylor*, 244 Ill. App. 3d at 467-68 (finding that exclusion of defendant's family members during *voir dire* to prevent juror contamination was facially valid but defendant's right to public trial was violated since the record failed to show likelihood of such); *People v. Willis*, 274 Ill. App. 3d 551, 554 (1995) (same). Therefore, the trial court's inherent power to exclude witnesses is not, by itself, dispositive of the issue. Rather, when the defense objected that Trea Smith was not a probable witness, we believe Smith's right to a public trial was implicated and that the circuit court was required to apply the overriding interest test set forth in *Waller*. The court made no explicit reference to the *Waller* test, but its ruling indicates that the court found that ensuring Trae Smith's untailored, independent testimony, as a potential witness, was an overriding interest that would be prejudiced if she were permitted to remain in the courtroom. The court's ruling further implies that it found that Trae Smith's exclusion until the State decided whether it would call her was necessary to protect the overriding interest and no reasonable alternative was better.

¶ 24    Here, the State failed to show that there was any reasonable probability that Trae Smith would actually testify. By the State's own admission, it was unlikely to call her. The State merely represented that it considered Trae Smith a potential witness to impeach any testimony Smith might give "as to the circumstances of what happened at the police department." This was a vague explanation that failed to indicate whether anything occurred during Smith's questioning that could be probative to the issues at trial. Yet, the State further explained that Smith and his mother had some interaction before he decided whether he would answer police questions and "[i]t's not just

a clear, like no, I don't want to talk." That representation implied that Smith gave a statement when he was questioned and that the State intended to introduce evidence of the statement. Smith, then, could be expected to try to impeach or rebut the statement through his own testimony. But the record reveals, as defense counsel first indicated before trial and the State acknowledged after trial, that this was not the case. At the police station, Smith invoked his right to counsel and made no statement. Thus, it is not apparent that the "circumstances of what happened at the police department" would have been relevant at trial, and it was unreasonable to expect that either party would elicit evidence concerning it. Indeed, such evidence would likely have been inadmissible— either as irrelevant or improper evidence of Smith's exercise of his fifth amendment rights. We believe that the State's posited circumstances in which Trae Smith might have been called to testify were so far-fetched that she could not be deemed a potential witness. Therefore, the interests underlying the exclusion of witnesses was not likely to be prejudiced by her presence in the courtroom during trial. Thus, we conclude that the record fails to support findings that would satisfy the *Waller* test for the court's exclusion of Trae Smith.

¶ 25    In addition, even if the circumstances of Smith's questioning were to become relevant somehow, the State had ample competent evidence at its disposal: the entire interview was video recorded and, presumably, there were police officers present who could authenticate the recording and testify to what occurred.

¶ 26    Further, to the extent that the court wished to prevent Smith's mother from tailoring her testimony to his, the court could have excluded her only during his testimony, if Smith were to testify. As the State represented, it only anticipated calling Smith's mother to testify in rebuttal, conditional on whether he testified about the circumstances of his questioning. Thus, a limited

exclusion consistent with the State's representation about her expected testimony was an available alternative.

¶ 27    We further observe that trial courts should carefully apply the *Waller* test in circumstances like this case and not rely on the representation that family members are potential witnesses. This would prevent the State from naming the defendant's family members as witnesses, without a *bona fide* expectation of calling them, as a pretext to exclude them from the courtroom for whatever advantage the State believes it gains by doing so. Illinois courts have recognized that a defendant's family members have a direct interest in the proceedings and must be permitted in the courtroom absent a showing that a compelling overriding interest is likely to be prejudiced by their presence. *Radford*, 2020 IL 123975, ¶ 34; *Revelo*, 286 Ill. App. 3d at 266.

¶ 28    For these reasons, we find that the circuit court's exclusion of Smith's mother, over his objection, failed to satisfy the *Waller* test to justify her exclusion and violated his right to a public trial.[3]

¶ 29    A violation of the public trial right is recognized as structural error. *Evans*, 2016 IL App (1st) 142190, ¶ 8. A structural error " 'erode[s] the integrity of the judicial process' " and " 'undermine[s] the fairness of the defendant's trial.' " *Id.* (quoting *People v. Thompson*, 238 Ill. 2d 598, 608 (2010)). As such, a defendant deprived of their right to a public trial is not required to show resulting prejudice. *Id.* Additionally, the error cannot be considered harmless. *People v. Averett*, 237 Ill. 2d 1, 14 (2010) (structural errors are not subject to harmless error review). Rather, automatic reversal is required. *Id.*. Accordingly, we reverse Smith's conviction and remand for a new trial. Although he does not challenge the sufficiency of the evidence, we note that the State

---

[3]It was proper, however, to exclude Trae Smith for the brief, limited time when this issue was being argued. At that point, the court lacked sufficient information to assess whether she was likely to be called as a witness and, thus, her presence during the argument could prejudice the potential overriding interest.

presented evidence upon which a rational factfinder could find Smith guilty of first degree murder beyond a reasonable doubt. Double jeopardy will not bar his retrial. *People v. Harris*, 2015 IL App (1st) 132162, ¶¶ 45-46.

¶ 30        Smith raises other contentions of error, but our resolution of his public trial claim is dispositive. "[C]ourts should refrain from deciding an issue when resolution of the issue will have no effect on the disposition of the appeal presently before the court." *Pielet v. Pielet*, 2012 IL 112064, ¶ 56. We may, however, address additional issues that are likely to recur on remand to provide guidance to the lower court and expedite the ultimate termination of the litigation. *Id.* We find that some of the other issues Smith raises are likely to recur and address them accordingly.

¶ 31                        B. Motion to Suppress Lineup Identifications

¶ 32        In a pretrial motion, Smith alleged that lineups were unduly suggestive and asked the court to suppress evidence of the identifications for trial. Smith argued that the lineups were unduly suggestive because the fillers substantially differed from him in age, weight, and hairstyle. Additionally, witnesses had described the shooter as having a Mohawk hairstyle and wearing a red and white shirt. Smith wore a red and white shirt in the second lineup he appeared in but not the first. None of the fillers in either lineup wore a similarly colored shirt or had a Mohawk hairstyle. Smith reiterates these arguments on appeal.

¶ 33        At an evidentiary hearing on Smith's motion to suppress, Harvey Police Department Detective Jason Banks[4] testified that he administered the lineups and described the procedures he used. Detective Banks was aware that witnesses had described the shooter as having a Mohawk hairstyle and wearing a red and white shirt. One witness, Arlanza Townsend, viewed a lineup at approximately 1:30 pm on August 11, 2012. Smith wore a tank-top undershirt during the lineup.

---

[4]Detective Banks was deputy chief of the Harvey Police Department at the time of his testimony.

The four fillers ranged from 5 to 13 years older than Smith, each outweighed him—the most by 55 pounds—and none had a Mohawk hairstyle. Townsend selected Smith from the lineup as the person he observed shoot Guice.

¶ 34   About eight hours later, five other witnesses viewed a lineup. This time, Smith wore the red and white shirt that was recovered from the Buick. Detective Banks testified that the shirt was among Smith's personal property and Smith chose to put it on sometime between the two lineups. Different individuals from the earlier lineup participated as fillers. Three fillers were between 5 and 14 years older than Smith, and the fourth was 30 years older. None had a Mohawk hairstyle. Each witness identified Smith.

¶ 35   The circuit court denied Smith's motion to suppress the identifications. The court explained:

"[I]n hearing the ages of the people who were a part of the composition of the lineup, you would think that people would look much older based on hearing the ages and the dates of birth. However, when I look at these photos, the Court does not find that these fillers and the people in this lineup look much older than the defendant.

It is actually surprising to hear their ages, because I'm looking at them and looking at the photos, and these are good lineups. Everyone is dressed different. The Mohawk that I'm hearing about, it is not very pronounced. It's not spiky or dyed a different color or anything that you see with people with Mohawks. It is a very subtle raise, I will say, in the middle of the defendant's head, but when you think of a Mohawk, when you're hearing [']Mohawk['], you would think of something much more pronounced.

So the majority of the people in here all have short hair and a natural hairstyle. There is one person in the first lineup that has braids. There is a weight discrepancy also

with one person in the first lineup. However, viewing these lineups, the Court does not find there's anything suggestive with a witness looking at these lineups. There's nothing that would jump out at that witness that would cause an improper identification."

¶ 36    When challenging a lineup identification, the defendant bears the initial burden to show it was impermissibly suggestive. *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 60. If the defendant makes such a showing, the burden shifts to the State to show by "clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). When reviewing a trial court's ruling on a motion to suppress a lineup identification, we adopt the trial court's factual findings unless they are against the manifest weight of the evidence and review the ultimate legal determination *de novo*. *Clifton*, 2019 IL App (1st) 151967, ¶ 61.

¶ 37    "Evidence of an identification, and any subsequent identification, must be excluded under the due process clause of the fourteenth amendment only where the pretrial encounter resulting in an identification was unnecessarily or impermissibly suggestive so that a very substantial likelihood exists that the offender was irreparably misidentified." *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 29. In determining whether an identification violated due process, courts must examine the totality of the circumstances. *Id.* ¶ 31. Courts have found lineups impermissibly suggestive when, "[t]hrough some specific activity on the part of the police, the witness is shown an individual who is more or less spotlighted by the authorities." *People v. Johnson*, 149 Ill. 2d 118, 147 (1992). Spotlighting has been found when the police effectively " 'all but hung a sign saying "pick me" around defendant's neck.' " *Clifton*, 2019 IL App (1st) 151967, ¶ 71 (quoting *People v. Maloney*, 201 Ill. App. 3d 599, 607 (1990)). In other words, due process is offended

when the procedure by design strongly suggests to the witness to select the defendant. *Johnson*, 149 Ill. 2d at 147.

¶ 38    Photographs of the two lineups Smith appeared in are included in the record on appeal. They were also admitted as exhibits at the suppression hearing and at trial. We agree with the circuit court's assessment that the age, weight, and hairstyle differences between Smith and the fillers do not appear as stark in the photos as the verbal description might lead one to expect. In appearance, the fillers are not grossly dissimilar from Smith in these respects. See *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 25 ("The participants in a lineup or photo array should not appear grossly dissimilar to the suspect."). We also agree that Smith's Mohawk is not so pronounced as to amount to spotlighting. Illinois courts have repeatedly found that a defendant's differing hairstyle, such as braids, does not render a lineup impermissibly suggestive. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 44; *People v. Love*, 377 Ill. App. 3d 306, 311 (2007); *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999); *People v. Simpson*, 172 Ill. 2d 117, 140 (1996); *People v. Trass*, 136 Ill. App. 3d 455, 463 (1985). Ultimately, the variation shown in the photos is consistent with what we ordinarily see in admissible lineups and these factors fail to establish that the lineups were unduly suggestive. The law does not require that participants in a lineup be identical or near identical. *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57. Differences in age, size, and appearance go to the weight of an identification, not necessarily its admissibility. *Ayoubi*, 2020 IL App (1st) 180518, ¶ 29.

¶ 39    The red and white shirt Smith is wearing in the second lineup, however, stands out more noticeably. Among the four fillers, two are wearing plain white T-shirts, one is wearing a gray sweatshirt with a logo, and the fourth, a black or dark blue and gray patterned button-down shirt. Smith's collared, short-sleeved shirt is white from the chest up with some dark logos. From the

chest down, it is bright red with white lettering. The lineup participants are sitting with their backs to a dull white wall. For a witness viewing this lineup, the red in Smith's shirt stands out against otherwise neutral colors.

¶ 40        This court has consistently maintained that "one distinct feature, standing alone, is not sufficient to render a lineup suggestive where the participants in the lineup otherwise have substantially similar appearances." *Clifton*, 2019 IL App (1st) 151967, ¶ 69. "[T]he mere fact that a suspect appears in the lineup with one article of clothing or distinctive feature that matched his or her description does not render a lineup suggestive." *Id.* ¶ 82. Insofar as the shirt stood out and was consistent with witness descriptions, the lineup was not unduly suggestive. However, Smith was not merely wearing a red shirt that happened to be consistent with witness descriptions. He was wearing *the* red shirt that police recovered from the silver Buick that fled from the Press Box just after the shooting. Presumably, police recovered the shirt with the expectation that it was evidence that might link Smith to the shooting. Indeed, the State introduced the shirt into evidence at trial where a witness identified it as the shirt worn by the shooter. Additionally, the officer administering the lineup was aware that witnesses described the shooter as wearing such a shirt before the second lineup took place. It should have been obvious to police that Smith's shirt not only made him stand out but that this distinctive feature was significant evidence by itself. A lineup where " 'only the suspect [is] required to wear distinctive clothing which the culprit allegedly wore' " has long been recognized as suggestive. *Ayoubi*, 2020 IL App (1st) 180518, ¶ 30 (quoting *United States v. Wade*, 388 U.S. 218, 233 (1967)). We believe this occurred in the second lineup.

¶ 41        We acknowledge, as the State points out, that police did not compel Smith to wear the red shirt in the second lineup. A sidebar discussion at trial indicated that, at some unspecified point in between the two lineups, police gave Smith the shirt because he told them he was cold. But police

could have easily addressed the problem by having Smith remove the shirt for the brief time witnesses were viewing the second lineup, providing him with a T-shirt or sweatshirt, or allowing his mother to bring a different shirt. Smith had been in police custody for nearly 20 hours by the time of the second lineup. *Cf. Clifton*, 2019 IL App (1st) 151967, ¶ 78 (describing "relatively easy" fixes for a lineup's suggestiveness). The second lineup may not have been suggestive by purposeful design but allowing Smith to wear the shirt under these circumstances amounted to the same.

¶ 42    Taking together that the shirt was recovered as evidence, witnesses described Smith wearing such a shirt prior to the lineup, and its stark contrast to the fillers, Smith was spotlighted in the second lineup. Accordingly, we find that the second lineup was unduly suggestive.

¶ 43    The trial court did not find that Smith met his burden to show that the second lineup was unduly suggestive. Thus, the burden never shifted to the State to show by clear and convincing evidence that the witnesses identified Smith based on their independent recollections. We can make this determination when the record is sufficiently developed. *Id.* ¶ 84 (citing *Brooks*, 187 Ill. 2d at 129). Three of the five witnesses who identified Smith in the second lineup testified at trial. Each witness testified about their observations that led them to identify Smith. It is not clear to us, however, that the trial testimony is sufficient for us to make an informed decision as to whether the witnesses identified Smith based on their independent recollections. Plus, the other two witnesses who identified Smith in the second lineup could potentially testify on retrial. The record, at present, tells us nothing about the basis of their identifications since they did not testify. Ultimately, the trial court is better suited for this inquiry. Thus, we vacate the trial court's order denying Smith's motion to suppress in part, only as to identifications made in the second lineup. On remand, the State may have the opportunity to show by clear and convincing evidence that the

witnesses identified Smith based on their independent recollections before the trial court rules on the motion to suppress as to identifications made in the second lineup.

¶ 44                                    C. Gunshot Residue Testimony

¶ 45        We next consider Smith's challenges to the gunshot residue expert's testimony. Mary Wong, an Illinois State Police (ISP) crime lab forensic scientist, was qualified as an expert in primer gunshot residue (PGR) analysis. She testified that she conducted PGR analysis of the red and white shirt recovered from the silver Buick and swabs of Smith's hands collected after he was arrested. Based on her analysis, Wong opined that Smith "may not have discharged a firearm with either hand." She added that "[i]f he did then the particles were either removed by activity, were not deposited or not detected by the procedure." Wong went on to explain that, to make a positive finding for the presence of PGR, the standards of the ISP crime lab require that she find at least three "tri-partite particles" consisting of lead, barium, and antimony. In her analysis here, Wong found only one particle in a sample obtained from a swab of Smith's right hand.

¶ 46        The State asked Wong whether a finding of only one particle would be sufficient for a positive PGR finding under the standards of other labs. Defense counsel objected to the question, and the court heard arguments in a sidebar. Defense counsel contended that the question was irrelevant since Wong had already testified that three particles were necessary to make a positive finding. The State countered that testimony concerning other labs would not change Wong's ultimate conclusion and, based on her knowledge of the standards of other labs, she should be permitted to testify, "even though where I work we require three[,] in our field, one is used." Defense counsel protested that this testimony differed from the report tendered in discovery, which only indicated that Wong did not make a positive finding for PGR. Defense counsel further argued that testimony about a one-particle standard at other labs would amount to expressing a positive

finding in this case; in other words, Wong would essentially testify that she would have made a positive finding for PGR on Smith's right hand, had she worked for a different lab. Adding to her argument, defense counsel posited that the State's question would be appropriate on cross-examination had the defense called Wong to testify, but, since the State bore the burden of proof, it was improper for the State to elicit expert testimony contradicting that expert's disclosed opinion.

¶ 47    The court likened testimony about differing PGR standards to expert testimony on fingerprint comparison. In the court's experience, it explained, fingerprint experts have testified to different standards to reach an opinion on whether compared prints are a match.

¶ 48    The court overruled the objection, and the State continued the line of questioning about the standards of other labs. Wong testified that she was aware from her research that some other labs require only one particle to make a positive finding for the presence of PGR. She further testified that particles are removed when a person runs, sweats, wipes their hands, or removes clothing. Particles also disappear after the passage of time, and she would not expect to find PGR if a sample was collected after six hours following a gunshot. Wong added that 34% of analyzed samples yield a positive finding.

¶ 49    On cross examination, defense counsel asked Wong if accuracy was ISP's basis for its three-particle standard. Wong explained that ISP set its standard at three particles following a study it conducted that found one false positive in a sample size of 80. Based on that study, ISP determined that one particle is the baseline and, for scientific validity, set its standard at triple the baseline, three particles.

¶ 50    In closing arguments, the State insisted that the jury should consider that one PGR particle was present on Smith's hand, despite Wong's testimony that three particles were required for her

to make a positive finding. The State asserted, "[t]hat in no way means that he did not fire a gun." The State also suggested that Smith likely removed PGR by rubbing his hands and removing his shirt.

¶ 51        On appeal, Smith claims this testimony should not have been allowed for two reasons. First, he argues that the testimony was not admissible because a one-particle standard is not generally accepted in the relevant scientific community. Second, he argues that the testimony amounted to a discovery violation since the expert's report tendered before trial only disclosed her opinion that she detected an insufficient number of particles to make a positive finding. We reject the first argument but agree with the latter.

¶ 52        Illinois follows the standard established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), that evidence based on a new or novel scientific technique is only admissible if the technique is generally accepted among the relevant scientific community. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77 (2002). "The purpose of the *Frye* test is to exclude new or novel scientific evidence that undeservedly creates a perception of certainty when the basis for the evidence or opinion is actually invalid." (Internal quotation marks omitted.) *In re Detention of New*, 2014 IL 116306, ¶ 26. However, this issue does not involve a new or novel scientific technique. Evidence of gunshot residue analysis has long been accepted in courts. Rather, Smith's challenge concerns the expert's testimony about differing standards to make a positive finding for the presence of PGR and the effect that testimony had on her conclusion. "[T]he *Frye* test does not concern an expert's ultimate conclusion but, instead, focuses on the underlying scientific principle, test, or technique used to generate that conclusion." *Id.* ¶ 28. We do not find that testimony about differing PGR standards was inadmissible. Smith offers no authority to show that a one-particle

standard is not generally accepted or that any court has found such testimony inadmissible. The number of particles goes to the weight of the evidence, not its admissibility.

¶ 53    Nevertheless, we find that the State violated its discovery obligation by eliciting testimony that contradicted the expert's disclosed report. Our conclusion is guided by our supreme court's decision in *People v. Lovejoy*, 235 Ill. 2d 97 (2009). There, a 16-year-old murder victim was found in a bathtub in her home. *Id.* at 106. Investigators identified a footprint on a bathroom tile matching the victim's stepfather, who she had accused of sexually assaulting her a few weeks earlier. *Id.* at 108. A report from the State's DNA expert tendered in discovery stated that a swab taken from the footprint was " 'negative to a presumptive test for the presence of blood.' " *Id.* at 113. Despite that, the expert testified at trial that the result was a "false negative" (*id.* at 108) since, she reasoned, the initial test used up all the hemoglobin so the second, more sensitive testing method, could not yield any reaction (*id.* at 114). The expert's trial testimony implied that the defendant's footprint was made in the victim's blood, but the State had not disclosed anything to that effect to the defense before trial. *Id.* at 114-15.

¶ 54    The defendant argued that the State was required to disclose the expert's finding that the test for the presence of blood was a false negative. Our supreme court agreed. The court rejected the State's claim that it complied with discovery since the expert's testimony was a logical inference from the information in the disclosed report. *Id.* at 119. The court remarked, "[t]here is nothing 'logical' about an expert testifying to a conclusion that stands in complete opposition to the conclusion stated in her own official report." *Id.* The court also observed that the expert's testimony was not spontaneous, as the State elicited it through direct questions. *Id.* The court found that the report was misleading, since it omitted relevant information and failed to disclose that the expert would interpret a test contrary to its reported result. *Id.* Under those circumstances, the

defendant was unfairly surprised and not afforded sufficient opportunity to prepare a rebuttal. *Id.* at 120.

¶ 55    We find the circumstances similar here. Wong's report indicated a negative result for the presence of PGR. Yet, the overall effect of her testimony was, despite the negative result, Smith likely fired a gun. The tacit message of testifying that other labs would find a single particle a positive result is that Wong believes her detection of one particle on Smith was a positive result—she is only prevented from saying so explicitly due to an ISP regulation. Wong also gave multiple reasons why a person who fired a gun would nonetheless produce a negative result—sweating, wiping hands, passage of time, and so on. Considering the entirety of her testimony then, Wong's wiggle-worded opinion that "Smith may not have discharged a firearm" is hardly consistent with the disclosed negative result. To be sure, her testimony sent the opposite message. And, just as in *Lovejoy*, it was not spontaneous as the State elicited this testimony through direct questions.

¶ 56    The State is free to argue that a defendant may have fired a gun despite a negative or insufficient PGR finding and elicit expert testimony to support that theory. See, *e.g.*, *People v. Meyers*, 2018 IL App (1st) 140891, ¶ 66 (finding prosecutor's comment that the presence of two particles was " 'hardly a negative' " was a reasonable inference from the evidence); *People v. Balfour*, 2015 IL App (1st) 122325, ¶ 41 (finding prosecutor's argument that particles detected on defendant's clothing connected him to the crime was a reasonable inference based on the expert's testimony even though it did not conclusively establish that he had fired a gun). But we believe the State must disclose that it will do so, with specifics, before trial to prevent unfair surprise evidence. The State failed to do so here.

¶ 57                                D. Closing Argument

¶ 58    Smith takes issue with several remarks the prosecutor made in closing argument and a sustained objection during his, which he claims, taken together, deprived him of due process. Since we have already determined that Smith is entitled to a new trial, reviewing this claim under the ordinary standard—whether remarks were so egregious as to warrant a new trial (*People v. Wheeler*, 226 Ill. 2d 92, 121 (2007))—would be redundant.

¶ 59    Nevertheless, the State twice posited that the jury could only find Smith not guilty if they believed the eyewitnesses had all "lied to your face" or "were all liars." This court has found the proposition that a defendant is only not guilty if the witnesses lied to be improper: it is a "misstatement of law and a serious error which shifts the burden of proof." *People v. Miller*, 302 Ill. App. 3d 487, 497 (1998). A defendant is never required to prove the State's witnesses were untruthful, as the statement implies. In this case, the proposition also misstates the evidence because the jury could find Smith not guilty if they believed the witnesses were simply mistaken, not lying. Ultimately, the statement is improper and risks denying a defendant a fair trial. *Id.*

¶ 60                                    E. Photo Given to Jury

¶ 61    During its deliberation, the jury sent the court a note that read, "Photo taken inside bar?" The question was interpreted to refer to a photograph that was included among Smith's belongings, which were inventoried when he was booked. A Harvey police officer authenticated those items, and they were admitted into evidence as a group exhibit. The photo was not published to the jury, and no further testimony was elicited about it. The photo appears to show Smith, wearing the same red and white shirt described and identified by witnesses, with other people making gestures.

¶ 62    Before trial, the defense requested that the photo be barred from evidence, arguing that the photo was prejudicial because the depicted gestures were gang signs or could be interpreted as such. The defense also represented that the photo was taken at the Press Box the night of the

shooting. The court ruled that the photo was admissible since it was probative of the shooter's identity, according to the State's proffer of expected witness testimony. But the court barred any reference to gangs.

¶ 63     After the jurors adjourned to deliberate, the parties argued which exhibits should be provided to the jury. The court ruled that the photo would not be given to the jury since no testimony was given as to when it was taken. The matter was reopened after the court received the jury's note. The defense argued that it was unclear which photo the jury was requesting, the photo was prejudicial, and the State failed to provide a foundation that the photo was taken at the Press Box the night of the shooting. The court ruled that the photo would be provided to the jury, finding that the photo was probative of identification and had been properly admitted into evidence.

¶ 64     On appeal, Smith argues that providing the photo in response to the jury question was error. We agree. Although the photo was properly admitted into evidence, responding with it to the jury's question as phrased supplied additional evidence than was presented at trial. This answered a factual question and filled in an evidentiary blank left by the State. See *People v. Maldonado*, 402 Ill. App. 3d 411, 434 (2010) (observing that no authority permits a court, after the close of evidence, "to fill in evidentiary blanks left by a party"). The State failed to provide evidence that the photo was taken at the Press Box the night of the shooting. The jury may have surmised so but giving them the photo in response to "Photo taken inside bar?" told them, with the court's imprimatur, that it was. Moreover, it places Smith at the scene wearing the distinctive shirt described by witnesses, though he was not wearing it when he was later arrested. In turn, this bolstered witness identifications of Smith as the shooter. The jury was free to connect these dots but answering the jury's question in this way connected a few for them. The photo should not have been provided to the jury in response to their question.

¶ 65                                          III. CONCLUSION

¶ 66        Based on the foregoing, we reverse Smith's conviction and remand this matter to the circuit court for a new trial.

¶ 67        Reversed and remanded.

***People v. Smith***, **2023 IL App (1st) 181070**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-16555; the Hon. Michele M. Pitman, Judge, presiding. |
| **Attorneys for Appellant:** | Steven A. Greenberg, of Greenberg Trial Lawyers, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, Hareena Meghani-Wakely, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |