2025 IL App (1st) 160406-U

SECOND DIVISION
June 17, 2025

No. 1-16-0406

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 12502 |
| | ) | |
| MARCUS FLOYD, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1   *Held*:   The judgment of the circuit court of Cook County finding defendant fit to stand trial is reversed; the trial court is directed to conduct a new retroactive fitness hearing because the nonpattern jury instruction on amnesia given to jurors effectively negated evidence about the impact of amnesia on defendant's ability to assist in his own defense; the cause is remanded for further proceedings consistent with this judgment.

¶ 2   Following a jury trial the circuit court of Cook County convicted defendant, Marcus Floyd, of first degree murder for the death of Chicago Police Department Officer Thomas Wortham IV (hereinafter, "Officer Wortham") and the felony murder of the co-offender in the crime that led to Officer Wortham's death, defendant's cousin, Brian Floyd. Brian Floyd was killed by Officer Wortham's father, Thomas Wortham III (hereinafter, "Mr. Wortham"), a retired Chicago Police Department officer, as he was trying to stop the crime, which occurred in front of his home. The jury also convicted defendant of attempt (first degree murder) of Mr. Wortham.

Mr. Wortham also shot defendant several times while attempting to stop the crime. As a result of his injuries defendant developed retrograde amnesia of the crime. Due to defendant's amnesia, before the trial of the charges the trial court held a trial before a jury of six to determine defendant's fitness for trial. The fitness jury found defendant fit for trial. Following trial, the trial jury found defendant guilty of the crimes charged and the court sentenced defendant to two consecutive terms of life imprisonment.

¶ 3 Defendant appealed both the judgment finding him fit to stand trial and his convictions. We reversed the judgment finding defendant fit to stand trial and remanded for a retroactive fitness trial, with instructions. We retained jurisdiction over the appeal to consider any preserved claims of error in the retroactive fitness hearing and defendant's appeal of his conviction should it be found defendant was fit to stand trial. *People v. Floyd*, 2019 IL App (1st) 160406, ¶ 62. On remand, the trial court conducted a retroactive fitness trial and a jury again found defendant fit to stand trial. We allowed supplemental briefing to address allegations of error in the retroactive fitness hearing. The parties have fully briefed the issues surrounding the retroactive fitness trial.

¶ 4 For the following reasons, we reverse the judgment of fitness for trial and remand for further proceedings consistent with this judgment.

¶ 5                                    BACKGROUND

¶ 6 The underlying facts of this case may be found in our dispositions of the appeals of codefendants Toyious Taylor (*People v. Taylor*, 2017 IL App (1st) 150726-U) and Paris McGee (*People v. McGee*, 2017 IL App (1st) 150838-U). In light of our holding we once again focus our discussion here on the retroactive fitness trial and only briefly recount the circumstances of the offense to the extent necessary to understand the retroactive fitness trial.

¶ 7     On the night of the occurrence, Officer Wortham left his parents' home in Chicago after visiting them. Mr. Wortham watched from his front porch as his son got on his motorcycle. Mr. Wortham saw defendant and Brian Floyd in the middle of the street. Officer Wortham rode his motorcycle to where they were in the street, stopped, and spoke to them. Mr. Wortham saw Brian put a gun to Officer Wortham's head. Mr. Wortham yelled for the men to get away from Officer Wortham and Brian turned and pointed his gun at Mr. Wortham. Brian yelled at Mr. Wortham to get back into the house. Officer Wortham then shouted "Police," and Mr. Wortham instantly heard gunfire. Mr. Wortham ran into the house to retrieve his gun and told his wife to dial 9-1-1. After Mr. Wortham ran back outside with his gun he saw a red car in front of his home facing the wrong direction on the one-way street. The passenger was outside the car yelling "Get in." Mr. Wortham told the passenger to "get away from there." The passenger got back into the car and the driver backed the car away. Mr. Wortham testified he thought the passenger fired a gun at him before the car reached the intersection. Mr. Wortham hid behind his daughter's car, saw Officer Wortham's gun on the ground and picked it up so that he then had a gun in each hand. Defendant and Brian were facing Mr. Wortham. Mr. Wortham saw a gun in Brian's hand. Mr. Wortham opened fire and saw both men go down. Mr. Wortham saw Officer Wortham on the ground approximately 20 yards away. The State elicited testimony that in addition to being shot multiple times Officer Wortham's injuries were consistent with being hit by a car and dragged.

¶ 8     Before the first fitness trial began the trial court granted the State's motion to bar the testimony of a defense witness who would testify as to why a defendant's ability to recall the incident that is the subject of the prosecution is relevant to that defendant's ability to assist in their own defense.

¶ 9    At the first fitness trial, Dr. Matthew Markos, a forensic psychiatrist, testified for the State. Dr. Markos testified that his clinical forensic psychiatric opinion to a reasonable degree of medical and psychiatric certainty following his examination of defendant was that defendant was "mentally fit to stand trial." Dr. Markos took defendant's amnesia into account in reaching his opinion. Dr. Markos testified defendant had reported amnesia and "in order to be able to assist his counsel, it was important for me to determine if he has the capacity to learn and retain new information."

¶ 10    At the first fitness trial Dr. Markos testified he asked defendant questions to determine if defendant had any knowledge of the crime itself and details pertaining to the crime, what the source of defendant's information was, and whether defendant had the capacity to learn and retain new information. Dr. Markos testified that defendant clearly demonstrated the capacity to learn new information from extrinsic sources and retain and remember it; defendant had the capacity to communicate with his attorney and cooperate with his attorney to obtain information; defendant did not have ongoing amnesia for day-to-day events and recent information, and the amnesia was "just for the arrest incident circumscribed and capsulated."

¶ 11    At the first fitness trial the State asked Dr. Markos about a second fitness examination he conducted of defendant. Dr. Markos testified in part as follows:

> "Again his memory was—pertained only to the arrest incident, and I did ask him additional questions again in order to determine a very important clinical issue, which is does he have the capacity today as we sit as it relates to his current fitness, the ability or the capacity to learn and retain new information and if he has the capacity to follow day-to-day events in his life at Cook County jail."

¶ 12    Dr. Markos testified there are special factors and added "amnesia, *per se*, does not equal unfitness. Amnesia, *per se*, does not deem someone unfit." Defendant's attorney objected but the trial court overruled the objection.

¶ 13    The State also called Dr. Christofer Cooper to testify as an expert at the first fitness trial. Dr. Cooper had examined defendant regarding defendant's fitness to stand trial. Dr. Cooper testified that the "issue at hand" was defendant's ability to understand what his attorney had informed him about what happened during the offense. Dr. Cooper stated that the "fundamental issue" on the question of defendant's fitness to stand trial was defendant's ability to retain information that had been extrinsically reconstructed from an external source by, for example, being told information by his attorney. Dr. Cooper opined that defendant was capable of assisting his attorney in his own defense because defendant "can learn, retain, process, logically evaluate anything that's presented to him." Dr. Cooper's expert opinion after twice examining defendant was that defendant was fit to stand trial.

¶ 14    After both parties rested the trial court proceeded with the jury instruction conference. The defense placed on the record its requested instruction based on section 104-16(b) of the Code of Criminal Procedure of 2012, which provides in part:

> "(b) Subject to the rules of evidence, matters admissible on the issue of the
> defendant's fitness include, but are not limited to, the following:
> (1) The defendant's knowledge and understanding of the charge, the proceedings,
> the consequences of a plea, judgment or sentence, and the functions of the
> participants in the trial process;

(2) The defendant's ability to observe, recollect and relate occurrences, *especially those concerning the incidents alleged,* and to communicate with counsel."

(Emphasis added.) 725 ILCS 5/104-16(b) (West 2016).

The trial court declined to give the instruction. In pertinent part, the trial court instructed the jury as follows:

"Matters on the issue of the defendant's fitness that you may consider include but are not limited to the following: Defendant's knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence and the functions of the participants in the trial process; *the defendant's ability to observe, recollect and relate occurrences* and to communicate with counsel; the defendant's social behavior and abilities; orientation as to time and place; recognition of persons, places and things and performance of motor processes.

Amnesia does not *per se* make a person unfit. A person is unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or he is unable to assist in his defense." (Emphasis added.)

¶ 15 Following the first fitness trial, the jury found defendant fit to stand trial.

¶ 16 On appeal from the fitness jury's verdict, defendant argued, in part, that he received ineffective assistance of counsel where his attorney failed to object to the State's witnesses stating an erroneous standard for fitness and the trial court gave the jury an instruction that bolstered the erroneous testimony and misled the jury as to the standard for fitness to stand trial. Defendant also argued that the trial court erroneously barred the defense from calling an expert

witness to testify as to how defendant's amnesia affects defendant's ability to assist in his defense. In the first appeal, we found that:

> "Regardless, our supreme court directs that amnesia of the alleged offense will not *always* render a defendant unfit to stand trial. *Stahl*, 2014 IL 115804, ¶¶ 34, 39. We note that our supreme court did not hold that amnesia, alone, will never render a defendant unfit for trial. Instead, our supreme court recognized the relevance of amnesia of the alleged events to a defendant's ability to assist in his or her own defense. *Id*. ¶ 38 (recounting testimony by attorney-expert describing how the defendant's amnesia as to the relevant events could negatively impact his ability to assist defense counsel). Our supreme court concluded there were 'a number of factors *** that should be considered on the issue of fitness' including the defendant's 'inability to communicate with counsel because he cannot recollect his actions and *mens rea* surrounding the incident.' *Id*. ¶ 39. Thus, 'under article 104 of the Code, amnesia as to the events surrounding the crime does not *per se* render a defendant unfit to stand trial. Rather, the fact that a defendant cannot recollect the incident at issue is just one of the circumstances that may be considered in determining a defendant's fitness." *People v. Floyd*, 2019 IL App (1st) 160406-U, ¶ 50.

¶ 17    We held that the trial court's instruction failed to identify a relevant factor in the fitness determination and, as a result, the trial court's instruction misled the jury and failed to correctly state the applicable law. See *Stahl*, 2014 IL 115804, ¶ 39. The missing factor was the defendant's ability to relate and recollect the incident alleged. *Floyd*, 2019 IL App (1st) 160406-U, ¶ 51. We found that the error prejudiced defendant. *Id*. ¶ 52. We found that the State's experts' testimony

and the prosecutor's argument in combination with the court's erroneous instruction left the jury with the firm impression that it should consider defendant's ability to recollect information communicated to him by his attorney and that it need not (indeed should not) consider defendant's ability to recollect and relate the occurrences of the incident alleged. *Id.* We also found that the trial court abused its discretion in barring defendant's expert's testimony as to how defendant's lack of memory affected defendant's ability to assist in his own defense. *Id.* ¶ 54.

¶ 18    We found that there was no genuine dispute defendant understood the nature and purpose of the proceedings against him and therefore the fitness hearing hinged on whether defendant could assist in his own defense. We found that absent consideration of defendant's ability to recollect the offense, the jury had no real basis upon which to decide defendant's ability to assist in his own defense, making the outcome a virtually foregone conclusion. *Id.* ¶ 53.

¶ 19    We reversed the judgment and remanded with instructions for the trial court to hold a full retroactive fitness trial in accordance with our order. *Id.* ¶ 62. We instructed the trial court to allow defendant's expert's testimony at a retroactive fitness trial. *Id.* ¶ 54. We also held that "the trial court must instruct the jury on all of the factors listed in the [fitness] statute that may be considered in determining a defendant's fitness for trial" and that the determination is to be made based on the totality of the circumstances. *Id.* ¶ 57 (citing 725 ILCS 5/104-16(b) (West 2018)). We directed defense counsel to object and the trial court to rule on the objection "if the State's witnesses restate an erroneous standard" for determining fitness. *Id.* ¶ 57.

¶ 20    On remand the trial court held a retroactive fitness trial. Before the trial began the defense filed a motion to exclude certain testimony by the State's witnesses. Specifically, defendant sought to bar the State from presenting expert testimony that "someone who suffers from amnesia can gain 'personal knowledge' of a past event by a process called 'extrinsic memory

reconstruction' which involves listening to others describe events that have been erased from memory." The motion complained that the State's experts had previously opined that defendant was fit to stand trial because he could learn about the events of the crime from "second-hand accounts" and that would create "personal memories" that defendant could use to assist in his own defense. The defense argued this "theory" of "extrinsic memory reconstruction" is not generally accepted in the relevant scientific community. The trial court denied the motion. The court believed the testimony proffered by the State's experts was consistent with *Stahl*. The court deferred ruling on a separate defense motion *in limine* to bar testimony that misstates the factors used to determine fitness.

¶ 21    The State called Dr. Erick Neu, a licensed staff psychologist with Forensic Clinical Services (FCS) for the Circuit Court of Cook County, to testify as an expert witness. Dr. Neu is board certified in the specialty of forensic psychology. He testified that forensic psychology is a specialty in psychology addressing "psycholegal" issues, meaning "a legal topic that has a psychological component" including, for example, fitness to stand trial. Fitness to stand trial is a "legal term, but there's a psychological component to it, whether somebody is having symptoms of mental illness or cognitive impairment that *** prevents them from being able to understand the proceedings or assist in their defense."

¶ 22    According to Dr. Neu, FCS exclusively conducts court-ordered mental health evaluations to address "legal issues that have a mental health component, such as a defendant's fitness to stand trial." Dr. Neu gratuitously added that FCS is "always impartial." The majority of evaluations Dr. Neu has conducted in his over 20 years with FCS have been fitness to stand trial-related evaluations. Dr. Neu described a fitness evaluation as determining "does the defendant have symptoms of mental illness or cognitive impairment that renders them either unable to

understand the nature of the proceedings and/or unable to rationally assist Counsel in their defense." A retroactive fitness evaluation is significantly similar to a fitness evaluation except that a retroactive fitness evaluation looks at a particular time frame in the past. Dr. Neu received a court order for an evaluation of defendant to determine his "retrospective fitness at the time of August [2015.]" Dr. Neu's evaluation of defendant consisted of reviewing defendant's medical records and a face-to-face meeting with defendant. Dr. Neu created a written report of his evaluation which assisted him in his testimony.

¶ 23    Dr. Neu testified that after the offense defendant was taken to the hospital with "severe, severe injuries" that at one point required defendant to be resurrected but the records did not document head injuries. Defendant was not shot in the head and did not receive blunt force trauma to the head. The hospital treated defendant for "acute physical injuries." Defendant was transferred to a different hospital for continued care and eventually defendant was transferred to a different hospital and placed in a rehabilitation wing. In June 2010, defendant received a psychological screening when he was placed in the rehabilitation wing. That psychological screening concluded that defendant was alert and fully oriented to place, time, and situation. Dr. Neu testified that defendant "was described as having his attention and concentration as well as his comprehension" and there were "no significant impairments" to his immediate and remote memory. Defendant's recent memory "was described as mild to moderately impaired." In this screening defendant stated, about the incident, " 'they said he shot a cop. I don't remember. I was shot by a cop.' " Defendant was diagnosed with "cognitive disorder, not otherwise specified due to anoxic encephalopathy."

¶ 24    Dr. Neu testified that a July 2010 psychological note from the rehabilitation hospital states that defendant denied feelings of depression or anxiety and that his first memory before the

offense was his going to high school. At the end of July 2010 the rehabilitation hospital discharged defendant. The discharge summary stated that defendant received " 'comprehensive rehabilitation for mobility, [activities of daily living,] and cognitive impairment, secondary to anoxic brain injury due to cardiac arrest as complication of [multiple gunshot wounds.]' " Anoxic brain injury is injury to the brain that occurs due to a lack of oxygen.

¶ 25    After he was discharged from the rehabilitation hospital defendant was admitted to Cermak Health Services for ongoing medical treatment. Dr. Neu testified he reviewed medical records from Cermak to look for things of clinical significance to his evaluation, "which was to see if there was concerns about [defendant's] memory or cognitive functioning documented." The records "did not document any significant concerns about [defendant's] intellectual or cognitive functioning" in November 2010. Defendant received occasional mental health evaluations and "on no occasion was he described as requiring mental health treatment." In particular defendant received a mental health evaluation in October 2011 after stating he was feeling down and suicidal, but defendant reported to the evaluator only "medical concerns and not mental health concerns." The evaluator reported they did not observe any symptoms of mental illness.

¶ 26    The October 2011 evaluation described defendant as fully oriented to time, place, and situation, as having normal speech and appearance, and that defendant's thoughts were organized with "adequate insight" and "adequate judgment." The evaluation concluded that defendant was not in need of mental health services. The evaluator "did not document any difficulty [defendant] had communicating with her" nor did she document any difficulty she had understanding him or any cognitive impairment. Subsequent evaluations also "documented that there were no mental health issues that would prevent [defendant] from being transferred" and there were no observed

or reported symptoms of mental illness. Again, later an evaluation contained "no mention of cognitive deficits" and reported that defendant did not appear to have difficulty understanding his evaluator. Specifically in August 2012 the evaluator reported that defendant "does not really have any [self-reported] mental health concerns" and did not document that the evaluator observed any mental health symptoms or notable cognitive impairment.

¶ 27    Dr. Neu opined that defendant's past medical records documented "significant improvement" with respect to his injuries at each subsequent medical facility. The retroactive fitness evaluation was to evaluate defendant as of August 2015, but Dr. Neu also reviewed defendant's medical records after 2015. He testified he did this as part of his retroactive fitness evaluation because "the early end of those additional records are important because they're within a couple of months of the timeframe that I'm interested in." Dr. Neu testified that they contained no history of defendant receiving mental health treatment. The records after 2015 did not describe defendant as either reporting or exhibiting any significant cognitive deficits or intellectual impairments. Defendant "was not deemed to require mental health treatment or any type of medication for mental illness at any time."

¶ 28    Dr. Neu opined that "during the actual time period that I'm interested in, [defendant] did not appear to have any significant mental health concerns based on the medical records." He added, that since the time defendant medically stabilized from the trauma caused by the gunshot wounds defendant "had not been described as exhibiting or reporting symptoms of mental illness, and he's not been described as exhibiting significant cognitive deficits." Dr. Neu opined that based on the medical records defendant had a "remarkable recovery" both physically and cognitively. Cognitively, the records from the first hospital in 2010 "describe significant

problems with his memory and cognitive functioning," but the later medical records "do not describe any visible or apparent impairment with his cognition.

¶ 29     In November 2021, Dr. Neu also personally interviewed defendant as part of his retrospective fitness evaluation. During the interview Dr. Neu conducted a mental status examination which consists of "a series of questions and observations to assess somebody's functioning and for signs and symptoms of mental illness." Dr. Neu found defendant to be "alert and fully oriented." Defendant had "adequate energy and ability to pay attention." Defendant knew his own name and what the situation was. Defendant was oriented to time and place. Defendant did not hallucinate during the interview. Dr. Neu found defendant's speech to be "organized and relevant." Defendant's responses to questions were related to what Dr. Neu was asking; defendant did not stray into something else. Defendant's answers were responsive and there were no obvious psychotic symptoms. Dr. Neu opined that during the evaluation there were no obvious significant cognitive deficits. Dr. Neu reached that conclusion because defendant's responses were relevant to the question, "meaning he was capable of understanding." Dr. Neu did not have to simplify his questions. He noted that defendant "was fairly articulate" and gave "kind of eloquent answers to questions."

¶ 30     Defendant reported to Dr. Neu that defendant had amnesia of the time period near the offense, both shortly before, during, and shortly after the offense. Defendant "also reported some continued mild memory problems" like forgetting names or portions of conversations. Dr. Neu testified that he confirmed with defendant that defendant has not required any treatment for this. Dr. Neu testified that talking to defendant, "he didn't seem like he was somebody who had significant cognitive impairment" and that "not a single mental health personnel who's evaluated him since he arrived to Cook County Jail described him as appearing to exhibit any significant

cognitive deficits." Defendant maintained "adequate attention and appropriate behavior through the evaluation."

¶ 31    Dr. Neu testified that you have to rely on self-reporting of whether or not someone remembers a specific day or specific incident. Dr. Neu testified "you can never, with a hundred percent certainty, confirm [amnesia] by giving somebody a psychological test or knowing a diagnosis that they have amnesia." There is no objective test to determine the span of the reported amnesia. Defendant reported retrograde amnesia in that "he didn't remember a period of time before the alleged offense and a period of time after the alleged offense." In contrast, anterograde amnesia "is when you have difficulty forming new memories." Defendant's amnesia added "an additional element" to Dr. Neu's "clinical focus during [his] evaluation for retrospective fitness in August 2015." Dr. Neu testified that when a defendant claims amnesia, what he is

> "looking for is at the time of the trial, had they recovered enough that they were able to form new memories; would they be able to sustain attention during the trial; would they be able to have conversations with their attorney; would they understand what their attorney is telling them; that they're able to speak coherently and in a relevant, organized manner with their attorney; would they be able to understand witness accounts and evidence about what happened; would they be able to look at and understand police report description[s] of the alleged offense;" and was defendant able to "make rational and informed decisions about his defense; understand court proceedings; understand the roles of the court personnel; understand witness accounts of what happened; understand evidence about what happened; and so on."

¶ 32    Dr. Neu testified, over defendant's objection, that,

> "The essence of a fitness evaluation is to evaluate whether somebody has
>
> symptoms of mental illness or cognitive impairment, that either causes them to
>
> not have an adequate understanding of the nature of the court proceedings and/or
>
> causes them to be unable to rationally assist their lawyer in their defense."

Dr. Neu questioned defendant on those issues. Dr. Neu testified, over objection, that,

> "[D]efendant indicated that he has no memory of the actual alleged
>
> offense, but he did express understanding of the charges. He indicated that he's
>
> been reviewing 'discovery' transcripts of his trial and that he *** was able to
>
> express an understanding of the allegations against him, based on learning about
>
> what allegedly transpired from reading other sources of information."

¶ 33    Dr. Neu testified that defendant told him that defendant's last memory before the offense was being at home with his daughter and her mother but defendant did not know how long before the offense that was. Defendant described the accusations against him to Dr. Neu. Dr. Neu testified that he wanted to assess whether defendant was "able to understand collateral sources of information about what happened." Dr. Neu testified that based on the fact that defendant claimed amnesia it is important to determine whether defendant had the ability to learn new information and retain new information from sources other than his memory.

¶ 34    Dr. Neu asked defendant how defendant could assist his attorney. Defendant answered, " 'talk to him.' " Defendant told Dr. Neu he was comfortable answering his attorney's questions to the best of his ability, being honest with his attorney, and considering his attorney's advice. Defendant volunteered that he could not help his attorney because his lack of memory of the offense caused him to be unable to help his lawyer.

¶ 35    Defendant recounted some of the testimony from his first trial to Dr. Neu based on defendant's memory of the trial and from reading transcripts. Defendant correctly described the plea bargaining process and, according to Dr. Neu, "he was able to rationally discuss his decision to go to trial." When asked why he went to trial defendant told Dr. Neu he was innocent and that although he could not remember the offense, in looking at the discovery he concluded he was just a bystander and that there is not enough evidence that he was involved in a plan.

¶ 36    Dr. Neu's conclusions from his retrospective fitness evaluation was that "both physically and mentally [defendant] made a remarkable recovery. And since his arrival to Cook County Jail, [defendant] has not been documented at any time as reporting or exhibiting any severe lingering cognitive deficits. *** [A]ll the encounters that he's had with mental health staff, he's not been described as appearing slow or struggling to understand what's being said to him, or struggling to express himself."

¶ 37    Dr. Neu concluded, including the records of psychological testing done of defendant closer in proximity to the trial, that "at the time of the trial, [defendant] was no longer having significant cognitive deficits." Dr. Neu opined that defendant is capable of learning and retaining new information that has been extrinsically reconstructed from a source other than his memory, that the reconstruction could be with his attorney, and defendant exhibited an understanding of the legal process. Defendant can learn information and is "able to logically process any information that is communicated to him." Defendant does not have any cognitive problem, intellectual problem, or psychological problem that would impair his ability to learn what happened through extrinsic sources. Dr, Neu's opinion to a reasonable degree of psychological certainty was that, "Defendant was fit to stand trial on August 20th of 2015." Dr. Neu based his opinion on defendant's understanding of the proceedings, he "demonstrated an ability to have

learned and retained information," and the medical records show that "by 2015, he did not have significant cognitive deficits that lingered." Dr. Neu concluded "there was nothing to suggest that at the time of [trial defendant] had cognitive deficits or symptoms of mental illness that would have significantly compromised his ability to understand the proceedings and/or to have significantly impeded his ability to have rationally assisted in his defense."

¶ 38   On cross-examination, Dr. Neu testified that his diagnostic impression of defendant was "history of mild neurocognitive disorder due to anoxic brain injury." Dr. Neu was aware that a person can be unfit for trial because of a psychological issue or because of a medical issue. Dr. Neu does not specialize in brain injury as a medical doctor and does not know the criteria a medical doctor would use to diagnose anoxic brain injury. As a psychologist he does not address the severity of an anoxic brain injury. Instead, he is looking for whether the "medical problem produce[s] symptoms of mental illness or cognitive defects that impact the referral issue." Dr. Neu does not recall ever evaluating a client who suffered from anoxic brain injury.

¶ 39   Dr. Neu agreed that the difference between "mild cognitive disorder" and major or severe cognitive disorder is how well the person functions on a daily basis; that is, how well they care for themselves and how they act. He also agreed that defendant had a history of mild cognitive disorder. Dr. Neu testified that a diagnosis of mild cognitive impairment "tells you nothing as to whether the person is fit or unfit. So it's not an important part of my evaluation." Dr. Neu testified that if he were to believe defendant when defendant says that he has no memory of the offense, then he would tell the jury that defendant has a cognitive impairment to his memory. What was significant to Dr. Neu was that from the time he arrived in jail no mental health or medical professional described defendant has having ongoing significant problems with his memory.

¶ 40     Dr. Neu admitted that he does not know enough about anoxic brain injury to describe the expected medical effects of that injury. Dr. Neu did not say that he could not read the medical records and know if defendant exhibited signs that would be expected from severe anoxic brain injury in the months and years after his injury because that is not the way he looks at things. He repeated that he determines whether, at the relevant time, the person had deficits that affected "both the legal [and] psycholegal criteria" which in this case was retrospective fitness to stand trial in August 2015. Dr. Neu agreed that defendant continues to suffer physical symptoms such as twitching and poor gait that would be expected from someone with severe anoxic brain injury and was on medications for them. But he later added that nothing in the medical records suggests that defendant has lingering significant cognitive impairment that impacts his understanding of the proceedings or ability to assist in his defense.

¶ 41     Dr. Neu agreed that memory loss is common with anoxic brain injury. He agreed that damage to different parts of the brain can affect different parts of memory while leaving other cognitive abilities and memories intact. He admitted that it is not unusual for someone in defendant's condition to have memory loss for the time of the event but to have retained most of their other cognitive abilities. Dr. Neu agreed that retrograde amnesia from the time of the trauma is associated with the type of injury defendant has.

¶ 42     Dr. Neu testified that he accepted that it is extremely likely that defendant has retrograde amnesia for the day he was shot. There is no therapy to restore memory for someone with retrograde amnesia. Dr. Neu testified, "There can be cases of permanent retrograde amnesia that there's no treatment that can restore the norm." Retrograde amnesia would not impact the ability to identify who the judge is or to state what a trial is or what is evidence. Dr. Neu did not ask defendant what he would do if a witness gave false testimony. Dr. Neu stated defendant brought

up his ability to testify in light of his amnesia; but Dr. Neu stated that if a person is not able to testify because they forgot what happened is "not something that's relevant to my opinion as to whether they're fit or unfit." Dr. Neu stated,

> "What I'm looking at is by the time of the trial, had he recovered enough that they're able to understand witness accounts of what happened; understand and follow along with testimony; look over the police reports; be able to have conversations with their lawyers. As a psychologist, that's what I'm asked to do. I'm not asked to say whether or not a person can testify because you don't remember."

¶ 43 Dr. Neu stated that his concern is whether a cognitive impairment prevents a defendant from testifying and not whether they are prevented from testifying because they do not remember what happened, and he described the latter as "a legal issue whether or not that prevents somebody from having a fair trial, not an issue that a psychologist decides *** this person can't testify." Dr. Neu admitted that "with amnesia, there could be legal reasons why somebody's unfit, but those are not reasons a psychologist would opine on."

¶ 44 Dr. Neu testified that when he spoke about defendant learning what happened from outside sources he did not mean that defendant had regenerated his own memory but that defendant has new memories of secondhand accounts, and defendant has no way of knowing whether those secondhand accounts are true or not.

¶ 45 After Dr. Neu testified the State indicated its intent to rest its case and the defense made a motion for a directed verdict. The defense argued that the issue of fitness in this case is surrounded by defendant's anoxic brain injury "and what it means about his ability to assist his attorney." The defense argued that the State's sole witness is not an expert in anoxic brain injury

"which *** is the focus of this trial." The defense highlighted Dr. Neu's testimony that

defendant is "mentally fit" because "there's no reason that I'm seeing that he had symptoms of

mental illness that rendered him unfit." The defense argued that the question of whether

defendant has a mental illness is irrelevant to this trial. The defense argued the State had failed to

meet its burden and asked for a directed verdict. The trial court denied the motion. The defense

also made a motion for a mistrial on the ground that there had been testimony about the trial and

defendant's guilt or innocence of the offense. The defense argued testimony about a trial of the

offense was prejudicial to defendant. The trial court denied the motion.[1]

---

[1]     It is notable that the trial court's statements in denying the motion for a mistrial reflect at least outwardly some confusion about the relationship between amnesia and fitness to stand trial. The court stated:

> "It strikes me that everybody seems to be concentrating, and perhaps the defense wishes to concentrate solely on the question of whether [defendant] suffers from amnesia and whether that renders him unit to stand trial, but that's not the only issue here. The issue isn't whether he has amnesia, the issue isn't whether that impacts his ability to be fit for trial. [(It is the issue.)] This is a general question.

> The question isn't whether—the jury isn't being called upon to say yes, he has amnesia or no, he doesn't. [(But they must accept or reject that fact to make the ultimate determination in this case.)] Yes, because of amnesia he's unfit or no, despite his amnesia, he is fit. [(Pursuant to *Stahl*, this is the precise question in this case. *People v. Stahl*, 2014 IL 115804, ¶ 39 ('we find that there are a number of factors, including defendant's inability to communicate with counsel *because he cannot recollect his actions and mens rea surrounding the incident* *** that should be considered on the issue of fitness')).] The question is whether he's fit."

The trial court's comments make clear that what it believed to be the dispositive questions required a determination of whether defendant was "able to understand the nature and puirposes of the proceedings against him, and that he is able to assist in his defense."

As we have tried to make clear, amnesia is sufficient, by itself, to render a defendant unfit for trial if that amnesia prevents the defendant from assisting in his own defense. Amnesia does not automatically render a defendant unable to assist in their defense, but rather the defendant must prove how amnesia prevents them from assisting in their defense. In this case, it appears defendant is arguing his amnesia prevents him from providing information to his attorney that could form the basis of a defense to the

¶ 46    The defense elicited expert testimony concerning defendant's extensive physical injuries and that as a result defendant suffered anoxic brain injury. A defense expert also testified that defendant's report of amnesia of the events is consistent with anoxic brain injury, and that it is common not to regain memory of the time surrounding a trauma with anoxic brain injury. A defense expert testified that defendant had a verified case of retrograde amnesia. There is no known treatment to restore lost memory. Another defense expert in the field of memory and cognition testified that he had never heard a claim that someone with retrograde amnesia could have their memory reconstructed with second-hand accounts of events. If someone with retrograde amnesia learned about events from other people, that would not be a true "autobiographical" memory.

¶ 47    The defense called Professor Herschella Conyers to testify. Professor Conyers is a licensed attorney and clinical professor of law and the University of Chicago Law School. Professor Conyers agreed that the defense had hired her to review documentation in this case and to "provide your expert insight into the type of assistance you would need from a client or an attorney would need from a client in a case like this." Professor Conyers testified that it is not enough to just know the allegations in the documents provided by the prosecution and that ethically an attorney cannot take the documents "as necessarily true and accurate." Professor Conyers testified this is because the attorney is ethically bound to represent their client to the best of their ability and in Professor Conyers' opinion it would be "unethical for me to without further inspection and without further investigation to take opposing counsel's word for it."

---

offense and, probably most importantly, there is no other source for that information because the only people who could provide it are deceased.

Professor Conyers testified that to prepare a defense an attorney must find and interview witnesses, visit the scene of the offense, become familiar with any medical or expert evidence, find your own expert, "and you need to talk with your client."

¶ 48    Professor Conyers testified that the documentation may provide an accurate account of a defendant's conduct but that a defense attorney's investigation can still reveal "other important evidence that may provide a partial or full defense." That could occur when the documentation says the defendant shot someone and they actually did, but the defense attorney would need to talk to their client to determine why, to determine what the client "was thinking at the time that he shot the other person." Professor Conyers testified "there are things that can in fact exonerate, not make the client guilty of the charged conduct." Professor Conyers testified that just saying a person did this "does not say that they're guilty or innocent."

¶ 49    Professor Conyers described the type of assistance in general that is sought from the defendant. Professor Conyers testified the attorney seeks "as much information as humanly possible" specifically "their telling of what the event was." The defendant may identify witnesses. The attorney wants "to know from the client what the client was thinking, what the client knew at the time that an event occurred, how the client obtained the knowledge that he had or she had about an event, and again are there other people *** can their conduct be explained in non-criminal ways." There may also be physical evidence that affirms or denies what the defendant says. Professor Conyers also testified that the amount and type of assistance needed from a client depends on the specific charges in the case.

¶ 50    The type of assistance needed in a felony murder case, as is this case, is different from other types of murder and other crimes. Felony murder only requires proof the defendant intended to commit the underlying offense. In a felony murder case the defense attorney needs to

know "what in fact the client knew about not only the murder aspect but about the underlying felony. *** If the client knows nothing about the underlying felony, then your decision may as well be different in deciding how to advise the client, again what other evidence or witnesses you would need to corroborate what the client was saying. *** [I]t varies and it depends very much on the specific facts of a specific case." In this case, defendant was charged with felony murder and based on Professor Conyers' review of the records "you have to expand your investigation of this and it starts definitely with being able to get from your client specifics about what he or she knew, who else could corroborate that," and testing that information "to make a coherent rational picture available to the trier of fact about exactly what happened in any given circumstance and then be able to make a reliable determination about responsibility."

¶ 51    Professor Conyers also testified that in a case charging the defendant with accountability for the actions of another, the type and amount of assistance needed from the defendant changes. In those cases, "what I need from a client *** is what the client knew, what the client believed was going to happen, what the client agreed to do and or not do and what the client's *** imputed investment is, and it's critical that what comes out is *** if that exists because accountability is something more than just being there." Professor Conyers responded to a hypothetical in which the client is with a person who shoots someone. In that instance, the client's conduct does not give much information about "what was going on with them and whether they were guilty of a crime."

¶ 52    Professor Conyers testified there would be more probing involved. In that type of case described in the hypothetical the defense attorney would need to talk to the client "extensively" to try to find out what the client was doing there, what the client knew about the shooter, how the client knew it, and what was the basis for that and what the client knew about the victim; and

"anything about his own state of mind that day." If in the hypothetical presented the client had no memory of the event there were "certain other parts of evidence that [the attorney] would try to fall back on to try and fill in that lack of assistance" from the defendant. Professor Conyers testified the defense attorney should "explore all possible avenues until they are exhausted" including talking to other witnesses who may be able to testify to what the defendant in that situation heard.

¶ 53    Professor Conyers testified specifically with regard to this case that the fact defendant could not tell his attorney "who said what" just before the shooting was a key component to preparing a meaningful defense because the defense is, "based on what he's charged with, what he saw, what he knew, what he observed and what he knew and how he knew it" to "allow counsel to figure out legitimate potential defenses." If defendant cannot provide that information, in another case the attorney would try to get that information from other people who heard the confrontation in this case but that is not available here because the people who heard the words and saw the confrontation with the victim are both deceased. It may also be useful to know what defendant and the deceased offender did earlier in the day in this case but there was nothing in what Professor Conyers reviewed "that says there was a witness who knew when they had come together."

¶ 54    Professor Conyers testified that defendant's testimony is very important in this case because, "if there is information [that] can only come from the client then it becomes necessary and it is critical then for the client to be able to assist you in preparing that defense" by testifying on their own behalf. The defendant cannot repeat on the witness stand what someone else told them; the defendant can only testify that "this is what somebody told me happened."

¶ 55    Professor Conyers opined that if defendant in this case cannot remember the events of that day, the "short answer" to the question of whether he would be able to assist his attorney in preparing a defense in this case is, "No." That conclusion is not "just a function of his amnesia" but is because of that and the other factors including the way the crime is charged and the state of the evidence taken together that "would make him unable to assist in his defense."

¶ 56    On cross-examination, Professor Conyers agreed that it is not necessarily true that objective witnesses exist in a given case, and possibly the witness the defense wants "doesn't even exist." Professor Conyers also agreed that what people are thinking can relate to their intent, and intent "can be formed in an instant," does not "need a lot of preplanning at all," and "can be determined by actions." However, Professor Conyers added that, "that's when this case[,] because as I reviewed the documents [defendant's] only action was standing there, so that it—he needed to be able to explain or offer some insight into why and standing there is not sufficient to assume [the] intent necessary." Professor Conyers agreed that "when you review the documents in the case and know the evidence, that's when you determine what possible defenses that you can put forth to the evidence that the prosecution has in the case." Professor Conyers agreed there may be other witnesses other than defendant with answers to the defense attorney's questions; however, she added that "those persons listed in the police report you need to explore further but *** the police report itself may not capture the full universe of potential witnesses that your client may need and may be the one to know about."

¶ 57    Professor Conyers testified that "what a client knows or intended at the time of the offense, and what the client—and only a client knows about who can or cannot corroborate that[,] became integral to providing a defense." Later, when asked whether the defense can only use viable defenses against the evidence that is in the case, Professor Conyers testified on cross

that, "I think you can only try a case with the evidence that's there and that's what the problem is there is evidence that one would want to have and does not because of the amnesia."

¶ 58 In response to questioning about defending a client without memory of the event or who was merely uncooperative, Professor Conyers did say that was possible but testified that "it depends on the *** nature of each individual case ***. *** [T]here are cases that require the client's input more than other cases." There may or may not be other sources of the information an attorney would need to defend this case. Professor Conyers stated that every case has limitations on the evidence that is available. On redirect Professor Conyers testified that in the police reports she reviewed no one said what the words were between defendant and the victim when they encountered each other on the street. Professor Conyers testified that there are gaps in the evidence that "in a normal case your client would fill in for you."

¶ 59 In closing argument, as it pertains to this appeal, the State began by stating that amnesia alone as to the events does not by itself render a person unfit to stand trial but should be considered together with all the other evidence. The State described this as the central issue in this case, "whether the defendant's *** amnesia in 2015 rendered him unfit to stand trial." The State told the jury (without objection) "the law answers that question for you" and repeated that, "Amnesia alone as to the events surrounding the crime does not by itself render a person unfit to stand trial." The State argued (over defense objection) that the phrase "does not by itself" "means that there has to be something in addition to the amnesia to find that the defendant was unfit, something in addition like a psychological issue. [A] further medical issue, a cognitive defect, something else in addition to the amnesia." The State argued that for defendant, "[t]here was nothing else."

¶ 60     The State argued that the ongoing issues defendant suffered from manifested in a physical manner, such as tremors and nerve pain. The State argued that in 2015 defendant could learn and retain new information, understand court proceedings, and participate in discussions with his attorney and make rational and informed decisions. The State then said, "it bears repeating. The law says amnesia alone as to the events surrounding the crime does not by itself render a person unfit to stand trial but should be considered by you together with all of the other evidence."

¶ 61     The State argued that whether the defendant can assist in his defense does not "begin and end with whether [the defendant] can tell [their] lawyer what happened." The State conceded defendant "is not able to relate the events surrounding the incidents that he is charged with," but argued defendant has demonstrated his competencies for other considerations given to the question of whether he can assist in his defense. Specifically, the State argued that defendant could observe, recollect, and relate new information as it related to the evidence and communicate with his attorney. The State argued defendant could do these things "outside of his amnesia, which by itself does not render someone unfit to assist counsel in his defense." The State noted evidence that defendant was oriented to time and place and could understand and interpret evidence and strategize with his lawyer and argued that "these are instructive for you when you're determining whether or not the defendant had the ability to assist counsel in his defense." The State concluded it could not "over state this enough" that "other than those physical, those lingering issues physically *** the only thing that [defendant] was left with was that amnesia, that alone does not render a person unfit to stand trial."

¶ 62     In rebuttal the State asserted that in 2015 defendant "had no cognitive issue ***. He has no mental health issues." The State argued that in 2015 defendant only had physical symptoms

related to anoxic brain injury. The State again argued that defendant can learn and retain new information and argued that the events of the crime are being reconstructed to defendant from "collateral sources that was given to him by possibly his lawyer" and "the contents in the police report" because he is claiming amnesia. The State argued the jury was not there to determine whether defendant has amnesia because amnesia alone is not enough for unfitness. The State argued that whether or not defendant has amnesia, "He is still fit to stand trial because he can learn and retain new information, create new memories from sources other than his memories."

¶ 63    The State claimed that Dr. Neu was an "expert in fitness to stand trial." The State argued defendant had "no cognitive defects that would impact and no psychological problems that would impact his fitness to stand trial." The State again argued that defendant was fit because defendant can communicate with counsel about the evidence and the strategy to defend the case. "He can go through a trial, *** knows what is going on, not on any ongoing amnesia." The State argued it is not required to prove defendant can meaningfully assist in his defense or that defendant must have a "meaningful defense." Rather, "It's just a defense." The State argued that defendant's memory is not the only source of viable defenses to this case. The State implied the trier of fact did not need to know what if anything defendant said because "the intention is there" from Brian Floyd pointing a gun at the victim. The State asserted, "There is nothing that defendant's lawyers can't do just because defendant has amnesia." The State argued defense counsel could put together viable defenses, cross-examine witnesses, and locate witnesses without defendant's help. The State argued, "There is nothing because of the fact that if [defendant] has amnesia his memory is not the only source to defend the crime charged, and if he did have amnesia he could assist counsel in his defense for the times that he did not have amnesia."

¶ 64　The State argued that "[n]o evidence of amnesia would impair his ability to defend himself" because a lawyer can "craft viable defenses" and try the case based on the evidence the State presents. The State argued that defendant "is able to assist in his defense except maybe for that one amnesiac period that he couldn't testify to his version of events, and who is to say his version of events is the right version? It presumes that he has some type of innocent explanation about it." Again, the State argued that amnesia alone does not render a defendant unfit to stand trial but amnesia was but "one little *** part of the equation."

¶ 65　The defense argued that due to his amnesia defendant could not assist with his defense to felony murder and accountability given the facts of this case including that the eyewitnesses with pertinent information were killed.

¶ 66　On the State's motion and over the defense's objection the trial court gave the jury a non-pattern jury instruction on the issue of fitness that stated amnesia alone does not render a defendant unfit. The trial court stated that it believed the nonpattern instruction was consistent with *People v. Stahl* and our earlier order in this case and that the instruction "accurately and adequately describes the law." The trial court gave the following instructions relevant to this appeal:

> "A person is unfit to stand trial, if, because of a mental or physical condition
>
> > he is unable to understand the nature and purpose of the proceedings against him;
> >
> > or
> >
> > he is unable to assist in his defense.

To establish that the defendant is fit to stand trial, the State must prove the following propositions:

First: That the defendant is able to understand the nature and purpose of the proceedings against him; and

Second: That the defendant is able to assist in his defense.

* * *

Matters on the issue of defendant's fitness include, but are not limited to, the following:

The defendant's knowledge and understanding of the charge, the proceedings, the consequences of a plea, judgment or sentence, and the functions of the participants in the trial process;

The defendant's ability to observe, recollect and relate occurrences, especially those concerning the incidents alleged, and to communicate with counsel;

The defendant's social behavior and abilities; orientation as to time and place; recognition of persons, places and things; and performance of motor processes.

Amnesia alone as to events surrounding the crime does not by itself render a person unfit to stand trial but should be considered by you together with all the other evidence."

¶ 67    The jury returned a verdict finding retroactively defendant was fit to stand to stand trial.

¶ 68    This appeal followed.

¶ 69                                    ANALYSIS

¶ 70    This is an appeal after remand for a second fitness trial after the first trial resulted in the jury finding retroactively that defendant was fit to stand trial but where the trial court's instructions to the jury failed to identify a relevant factor in the fitness determination and, as a result, misled the jury and failed to correctly state the applicable law. A defendant's fitness to stand trial is a question of fact. See *People v. Stillman*, 61 Ill. App. 3d 446, 451 (1978). "A reviewing court should not substitute its judgment for that of the jury on a question of fact unless the jury's verdict is against the manifest weight of the evidence." *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 199 (1990), *Joel R. by Salazar v. Board of Education of Mannheim School District 83, Cook County, Illinois*, 292 Ill. App. 3d 607, 613 (1997) ("Questions of fact, whether determined by a jury or by the circuit court in a nonjury case, are reviewed under the deferential, manifest weight of the evidence standard.").

>   "A finding of fact or verdict is against the manifest weight of the evidence
>   where, upon review of all the evidence in the light most favorable to the
>   prevailing party, an opposite conclusion is clearly apparent or the fact-finder's
>   finding is palpably erroneous and wholly unwarranted, is clearly the result of
>   passion or prejudice, or appears to be arbitrary and unsubstantiated by the
>   evidence." *Joel R. by Salazar*, 292 Ill. App. 3d at 613.

¶ 71    However, if this court determines that the jury's verdict resulted from an erroneous jury instruction reversal is warranted if "the erroneous instruction clearly misled the jury and resulted in prejudice to the appellant." *Pearson v. DaimlerChrysler Corp.*, 349 Ill. App. 3d 688, 696 (2004).

¶ 72    Defendant raises several arguments on appeal from the jury's verdict finding that defendant was fit for trial in 2015. The issue that we find dispositive of this appeal is whether the

trial court erroneously instructed the jury that amnesia alone was an insufficient basis on which to find defendant unfit. For the following reasons, we find the trial court did err in its instructions to the jury. The trial court's instructions misled the jury as to how to apply the fitness standard and resulted in prejudice to defendant. *Pearson*, 349 Ill. App. 3d at 696. We find that the argument raises an issue of plain error; therefore, we review the error despite defense counsel's failure to preserve the error. See *People v. Ulloa*, 2015 IL App (1st) 131632, ¶ 25 ("The misstatement of the applicable law *** is a grave error, affecting the fundamental fairness of the trial and the integrity of the judicial process."). We remand with instructions for another fitness trial. Because of this finding we have no need to address defendant's remaining arguments on appeal. *Goral v. Dart*, 2020 IL 125085, ¶ 76 ("reviewing courts ordinarily will not consider issues that are not critical to the disposition of the case presented or where the result will not be affected regardless of how the issues are decided"). However, we will address any remaining issues only to the extent questions may arise on remand.

¶ 73    Turning to the issue of the instructions to the jury, we begin with the principles applicable to the fitness determination specifically and the principles applicable to jury instructions generally. Whether a defendant is fit to stand trial is governed by statute. See 725 ILCS 5/104-1 through 5/104-31 (West 2014). In Illinois a defendant is presumed fit to stand trial. 725 ILCS 5/104-10 (West 2014). A defendant is not fit to stand trial "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id*. The fitness statute provides that:

> "matters admissible on the issue of the defendant's fitness include, but are not
>
> limited to, the following:

(1) The defendant's knowledge and understanding of the charge, the proceedings,

the consequences of a plea, judgment or sentence, and the functions of the

participants in the trial process;

(2) The defendant's ability to observe, recollect and relate occurrences, especially

those concerning the incidents alleged, and to communicate with counsel;

(3) The defendant's social behavior and abilities; orientation as to time and place;

recognition of persons, places and things; and performance of motor processes."

725 ILCS 5/104-16(b) (West 2014).

¶ 74    Generally, "[l]itigants are entitled to have the jury instructed on the issues presented, the applicable legal principles, and the facts that must be proved to support a verdict. [Citation.] The trial court has discretion to determine which instructions to give the jury, and that determination will not be disturbed absent an abuse of that discretion." *Martin v. City of Chicago*, 2023 IL App (1st) 221116, ¶ 18. "[T]he trial court must instruct the jury with an IPI Criminal instruction unless the court determines that it does not accurately state the law." *People v. Sito*, 2013 IL App (1st) 110707, ¶ 26 (citing Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013); *People v. Hudson,* 222 Ill. 2d 392, 399-400 (2006)). "The trial court, in its discretion, may give a non-IPI instruction when the pattern instructions do not adequately state the law." *People v. Eddington*, 117 Ill. App. 3d 953, 962 (1983). The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. *Martin*, 2023 IL App (1st) 221116, ¶ 18. "When the question is whether the applicable law was conveyed accurately *** the issue is a question of law, and our standard of review is *de novo*." *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13.

¶ 75    Our supreme court construed the law applicable to the fitness determination in *People v. Stahl*, 2014 IL 115804, and this court provided its interpretation of *Stahl* in defendant's appeal from his original fitness trial. *Floyd*, 2019 IL App (1st) 160406-U. The parties did not file a petition for leave to appeal to our supreme court from this court's earlier order in this case; thus, our order in *Floyd*, 2019 IL App (1st) 160406-U became the law of the case binding on any further proceedings. *Hamilton v. Faulkner*, 96 Ill. App. 2d 415, 418 (1968) ("the judgment of this court is the final disposition of the case on the issues decided in the first appeal, absent a petition for rehearing or a petition for leave to appeal to the Supreme Court"), *Harris Trust & Savings Bank v. Otis Elevator Co.*, 297 Ill. App. 3d 383, 388 (1998) (in the absence of an order granting rehearing in this court or leave to appeal to our supreme court, "our decision becomes the law of the case, and binds the parties and the trial court in any subsequent proceeding on remand").

¶ 76    We recognized that in *Stahl*, just as it was in this case, "the primary issue was 'whether, under article 104 of the Code [of Criminal Procedure, the] defendant's amnesia as to the events surrounding the crime alone renders him *per se* unfit to stand trial.' *Stahl*, 2014 IL 115804, ¶ 25." *Floyd*, 2019 IL App (1st) 160406-U, ¶ 44. We observed that our supreme court rejected the appellate court's suggestion that " 'amnesia as to the events surrounding the crime will always render a defendant until to stand trial ***.' *Stahl*, 2014 IL 115804, ¶ 34." *Id*. ¶ 49. Thus, we concluded that "our supreme court directs that amnesia of the alleged offense will not *always* render a defendant unfit to stand trial. *Stahl*, 2014 IL 115804, ¶¶ 34, 30." (Emphasis in original.) *Id*. ¶ 50. However, in the very next sentence, we also noted that "our supreme court did *not* hold that amnesia, alone, will *never* render a defendant unfit for trial." (Emphases added.) *Id*.

¶ 77    In the first appeal, we went on to find that under *Stahl*, amnesia of the offense is relevant to a defendant's ability to assist in his or her own defense. *Id*. ¶ 50 (citing *Stahl*, 2014 IL 115804, ¶ 38). We wrote that "[o]ur supreme court concluded there were 'a number of factors * * * that should be considered on the issue of fitness' including the defendant's 'inability to communicate with counsel because he cannot recollect his actions and *mens rea* surrounding the incident.' [Citation.]" *Id*. ¶ 50 (quoting *Stahl*, 2014 IL 115804, ¶ 39). We concluded, and perhaps engendered some confusion, that " 'under article 104 of the Code, amnesia as to the events surrounding the crime does not *per se* render a defendant unfit to stand trial. Rather, the fact that a defendant cannot recollect the incident at issue is just one of the circumstances that may be considered in determining a defendant's fitness.' [Citation.]" *Id.*

¶ 78    We believe it is clear that we interpreted *Stahl* to mean that amnesia by itself does not *always* render a defendant unfit for trial, but it *could*, by itself, render a defendant unfit for trial if, because of the amnesia, the defendant is unable to assist in their own defense. *Id*. ¶ 50 (citing *Stahl*, 2014 IL 115804, ¶ 38) ("We note that our supreme court did not hold that amnesia, alone, will never render a defendant unfit for trial."). A defendant might be unable to assist in their own defense if, for example:

> "(1) defendant could not tell counsel his version of the events or what his state of
> mind was at the time, information that is critical to understanding what defenses
> might be available; (2) he could not meaningfully testify in his own defense
> because he could not remember the events at issue; and (3) he could not even
> intelligently decide how to plead because he did not know whether he committed
> any of the acts charged." *Stahl*, 2014 IL 115804, ¶ 38.

Our supreme court found these factors to be among "a number of factors," including defendant's inability to recollect his *mens rea* surrounding the incident, "that should be considered on the issue of fitness." *Stahl*, 2014 IL 115804, ¶ 39. Yet on remand the trial court in this case instructed the jury that "[a]mnesia alone *** *does not* by itself render a person unfit to stand trial" (emphasis added), which we find functionally equivalent to instructing the jury that "amnesia, alone, [*will never*] render a defendant unfit for trial," where we find that in this context "does not" has the same effective meaning as "will never."

¶ 79    When we determine whether the trial court's jury instruction fairly, fully, and comprehensively apprised the jury of the relevant legal principles (*Martin*, 2023 IL App (1st) 221116, ¶ 18), we look at the instructions as a whole. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273-74 (2002) ("The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles."). Furthermore, the proper test of a jury instruction is "not what meaning the ingenuity of counsel can at leisure attribute to the instructions, but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary [people] acting as jurors will understand the instructions." *Reivitz v. Chicago Rapid Transit Co.*, 327 Ill. 207, 213 (1927). In this case, the jury was instructed both that:

"A person is unfit to stand trial, if, because of a mental or physical condition

he is unable to understand the nature and purpose of the proceedings

against him;

or

he is unable to assist in his defense.

> Amnesia alone as to events surrounding the crime does not by itself render a person unfit to stand trial but should be considered by you together with all the other evidence."

¶ 80    These instructions in combination prevented the jury from fairly determining whether, because of defendant's amnesia, he was unable to assist in his own defense in the manner testified to by defendant's expert because the only "mental or physical condition" at issue was amnesia, and the jury was instructed that amnesia, alone, is not enough to render a defendant unfit. Although the jury heard evidence of defendant's physical injuries and anoxic brain injury and defendant's current mental state, all of the evidence pointed back to defendant's amnesia as the condition that allegedly made him unfit for trial. The instruction erroneously reinforced the State's theme presented through its witnesses and made in its closing argument that defendant was fit for trial because his only mental or physical condition was amnesia of the offense and amnesia alone does not render a defendant unfit. The trial court's instruction effectively negated evidence about the impact of amnesia on defendant's ability to assist in his own defense— evidence that our supreme court deemed relevant in *Stahl*. See *Stahl*, 2014 IL 115804, ¶¶ 38-39.

¶ 81    "If the court fails to properly instruct on any of [the] key issues [in the case,] the defendant's right to a fair trial is seriously in doubt. [Citation.] The giving of contradictory instructions on an essential element of the case is prejudicial error and will not be cured by the fact that another instruction is correct." *People v. Johnson*, 254 Ill. App. 3d 74, 79 (1993) (citing *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977)). See also *Floyd*, 2019 IL App (1st) 160406-U, ¶ 43 ("In determining whether a party has been prejudiced, we consider whether the instructions, taken as a whole, were sufficiently clear so as not to mislead the jury. [Citation.] * * * [T]here must be a reasonable basis supporting the conclusion that, but for the error, the verdict might

have been different. [Citation.]"). The erroneous instruction misled the jury as to how to consider the evidence. The erroneous instruction prevented the jury from properly considering relevant evidence. We find that the instruction prejudiced defendant. *Id.*

¶ 82    The fitness standard is determined by the fitness statute. "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2014). The only issue in this case is defendant's ability to assist in his defense. That jury must answer that question in the factual context of this case based on relevant evidence.

> "(b) Subject to the rules of evidence, matters admissible on the issue of the
> defendant's fitness include, but are not limited to, the following:
> (1) The defendant's knowledge and understanding of the charge, the proceedings,
> the consequences of a plea, judgment or sentence, and the functions of the
> participants in the trial process;
> (2) The defendant's ability to observe, recollect and relate occurrences, *especially*
> *those concerning the incidents alleged*, and to communicate with counsel;
> (3) The defendant's social behavior and abilities; orientation as to time and place;
> recognition of persons, places and things; and performance of motor processes."
> (Emphasis added.) 725 ILCS 5/104-16 (West 2014).

¶ 83    Under *Stahl*, amnesia alone may be a basis for unfitness *if* the amnesia prevents the defendant from assisting in their own defense. The jury must make that determination based on all of the admissible evidence presented at the fitness trial. *Id.* Amnesia alone may prevent a defendant from assisting in his own defense if, for example, defendant's ability to "recollect and relate occurrences *** concerning the incidents alleged" based on the ability to learn and retain

information from just reading police reports is not enough to assist in his own defense or if, given the specific facts of the case, knowledge that only could come from defendant's memory is needed to sufficiently relate occurrences concerning the incidents alleged to assist in the defense. Compare *People v. Schwartz*, 135 Ill. App. 3d 629, 640 (1985) ("Under these particular circumstances, we find that defendant was able to fully develop and effectively present his insanity defense before the jury. Nothing in the record suggests that defendant's own testimony was necessary to bolster his already well-supported theory of defense."). The trial court's instructions as a whole misled the jury as to whether it could ever reach this question.

¶ 84 The error in instructing the jury requires remand for a new fitness trial. On remand, any testimony or argument mischaracterizing the law to be that amnesia is categorically not a basis for a finding of unfitness is improper and should be excluded.

¶ 85 When we previously found an instructional error we remanded this case for a retroactive fitness trial. *Floyd*, 2019 IL App (1st) 160406-U, ¶ 62. We believe that is the proper remedy in this case, but first we must briefly address defendant's motion for a directed verdict. "It is well established that a verdict of competency may be directed in a proper case." *People v. Speck*, 41 Ill. 2d 177, 205 (1968), reversed on other grounds, *Speck v. Illinois*, 403 U.S. 946 (1971).

> "The ultimate test as to whether a trial judge should direct a verdict is
> found in *Pedrick v. Peoria and Eastern Railroad Co.*, 37 Ill. 2d 494, 510, as
> follows:
>
> 'In our judgment verdicts ought to be directed *** only in those cases in
> which all the evidence, when viewed in its aspect most favorable to the opponent,
> so overwhelmingly favors movant that no contrary verdict based on that evidence
> could ever stand.' " *Speck*, 41 Ill. 2d at 205.

Accord *People v. Miller*, 393 Ill. App. 3d 1060, 1063 (2009) ("The standard for a directed finding requires the court to take the evidence in the light most favorable to the nonmoving party and to determine if that party could be deemed to have met its burden of proof."). "Motions for directed verdicts and motions for judgment *n.o.v.* present questions of law, and therefore, our review is *de novo.*" *Claffey v. Huntley*, 2021 IL App (1st) 191938, ¶ 13.

¶ 86    Defendant argues the State's expert "offered no opinion about whether [defendant's] brain injury precluded him from assisting in his defense." Defendant claims the State's expert "acknowledged that his opinion regarding [defendant's] fitness was limited to the undisputed question of whether [defendant] was psychologically fit" (emphasis omitted) in that the State's expert opined defendant did not suffer from mental illness or cognitive defects. Defendant also complains the State failed to present evidence from a legal expert regarding whether defendant's amnesia would have impacted defendant's ability to assist in his own defense by assisting counsel's determination of what defenses might have been available, by impeding his ability to testify, or by impeding his ability to knowingly plead. Defendant asks this court to review the denial of his motion for a directed verdict for plain error.

¶ 87    The State responds its expert "established that defendant had the ability to learn, retain, and process new information, make rational choices, and work with his attorney, which established that [defendant] could assist in his defense, even if he could not remember the shooting." The State asserts its expert testified that he did consider defendant's amnesia as part of his evaluation. The State argues that as a board-certified forensic psychologist its expert could opine as to "a legal topic that has a psychological component" such as fitness to stand trial.

¶ 88    We find that the trial court did not err in denying defendant's motion for a directed verdict.

"The standard for a directed verdict *** is high and not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. [Citations.] In ruling on these motions, a court does not weigh evidence nor consider credibility of witnesses; rather, the court only considers the evidence and any inferences therefrom in the light most favorable to the nonmoving party. [Citation.] Judgment should not be entered on either motion when there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. [Citation.]" (Internal quotation marks omitted.) *Claffey*, 2021 IL App (1st) 191938, ¶ 13.

¶ 89 Here, the State did present some evidence that defendant could assist in his own defense using information gained about the offense from outside sources. Defendant, on the other hand, presented expert testimony as to all the reasons that may not be true in this case, including the fact that certain information crucial to a defense may only be available from defendant. It would have been up to the jury to weigh these conflicting opinions. Our holding is that the erroneous instruction foreclosed even the consideration of those conflicting opinions because the only physical or mental condition weighing on fitness was defendant's amnesia, and the trial court erroneously instructed the jury that amnesia alone is not a sufficient mental condition on which to base a finding of unfitness. Under *Stahl*, amnesia alone does not always preclude a defendant from assisting in their own defense, but it can. If properly instructed the jury would have been required to weigh conflicting evidence. Therefore, the trial court properly denied the motion for a directed verdict at the close of the State's case. *Id*.

¶ 90     In this appeal from the retrospective fitness trial defendant also argued that the judgment that defendant was fit to stand trial is against the manifest weight of the evidence; the State's expert misrepresented the fitness standard or, alternatively, the State's expert's opinion should have been subject to a determination of whether the expert's opinion was generally accepted in the relevant scientific community; the trial court should have declared a mistrial when the prosecutor "told the jury the evidence at the murder trial established that defendant possessed a gun" and improperly argued that defendant had the specific intent for felony murder; and the State's closing argument misstated the fitness standard, diminished the State's burden of proof, and misrepresented the defense evidence. "[C]ourts should refrain from deciding an issue when resolution of the issue will have no effect on the disposition of the appeal presently before the court. [Citation.]" *People v. Smith*, 2023 IL App (1st) 181070, ¶ 30.

¶ 91     We decline to address defendant's argument that the finding of fitness is against the manifest weight of the evidence. As we previously stated, our holding that the trial court committed instructional error means that the jury never properly considered the evidence. *People v. Johnson*, 2021 IL App (1st) 190567, ¶ 30 ("We hold that the [second-prong] plain error the trial court committed by failing to correctly instruct the jury on the limited use of evidence for the crime of witness tampering is so misleading and prejudicial that it requires reversal and remand for a new trial."). We will not find that a judgment is against the manifest weight of the evidence where the judgment is not based on a proper consideration of the evidence. A new fitness trial is required. *Id*.

¶ 92     "It is well settled that Illinois courts cannot *** render an advisory opinion, or give legal advice as to future events." *In re Luis R.*, 239 Ill. 2d 295, 306 (2010). See also 48A C.J.S. Judges § 154 ("In exercising judicial power, a judge may not give an advisory opinion on any subject,

and it is not a judge's responsibility to give legal advice to a party to the proceeding."). Because we remand for a new fitness trial we must decline to make any determination as to whether the State's evidence or arguments misstated the fitness standard because to do so may amount to unintended "advice" on the future trial. We have provided clear instruction on the meaning of *Stahl* as it relates to the fitness standard. We will not presume that the State will violate our order that further proceedings conform to this order. Passing judgment on the State's prior conduct, whether to affirm it or decry it, will have no impact on this decision and may amount to "advice" to the State. Therefore, we expressly make no determination on those issues.

¶ 93    "We may, however, address additional issues that are likely to recur on remand to provide guidance to the lower court and expedite the ultimate termination of the litigation." (Internal quotation marks omitted.) *Smith*, 2023 IL App (1st) 181070, ¶ 30. With that in mind, we first briefly address defendant's argument that Dr. Neu's testimony should have been subjected to a *Frye* hearing.

> "The purpose of the *Frye* test is to exclude new or novel scientific
> evidence that undeservedly creates a perception of certainty when the basis for the
> evidence or opinion is actually invalid. [Citation.] *** We review *de novo* a trial
> court's determination of whether a *Frye* hearing is necessary and whether there is
> general acceptance in the relevant scientific community." (Internal quotation
> marks omitted.) *In re Detention of New*, 2014 IL 116306, ¶ 26.

"Initially, we must consider whether [the] expert testimony *** is the type of scientific evidence subject to the screening function served by the *Frye* test." *Id.* ¶ 28. "Although not always easy to identify, we have held that generally, scientific evidence is new or

novel if it is "original or striking" or does "not resembl[e] something formerly known." (Internal quotation marks omitted.) *Id*. ¶ 34.

> "If an expert's opinion is derived solely from his or her observations and experiences, the opinion is generally not considered scientific evidence. [Citation.] On the other hand, if the expert's opinion is derived from a particular scientific methodology, such as the application of scientific principles or the use of other literature or studies, then the opinion is generally considered scientific."
> *In re Marriage of Alexander*, 368 Ill. App. 3d 192, 197 (2006).

¶ 94    Defendant argues there is no evidence that the relevant scientific community generally accepts Dr. Neu's opinion "that a defendant's ability to assist counsel in his defense can be determined by assessing his ability to learn, retain, and discuss new information from extrinsic sources." Defendant also argues that its own expert testified that he had never heard an expert claim that a person can have their memory reconstructed from extrinsic sources. Dr. Neu's testimony was not "original or striking" scientific evidence that did not "resembl[e] something formerly known." *In re Detention of New*, 2014 IL 116306, ¶ 34. He merely testified defendant can learn new things and in doing so assist his defense attorney. This is not new or novel of amnesiacs. See *Schwartz*, 135 Ill. App. 3d at 639-40. Furthermore, defendant's complaint is with Dr. Neu's conclusion that defendant is fit based on certain facts, not with how he determined those facts through the use of "a particular scientific methodology, such as the application of scientific principles or the use of other literature or studies." *In re Marriage of Alexander*, 368 Ill. App. 3d at 197. Dr. Neu's opinion was "derived solely from his *** observations and experiences," *Id*.

¶ 95    We also find that Dr. Neu's opinion is not "new" or "novel" because it is consistent with the statute. As once stated by the trial court, "the issue is fitness," the standard for which is governed by statute as stated above. The fitness statute provides a non-exhaustive list of matters admissible on the issue of the defendant's fitness that includes both the defendant's ability to recollect and relate occurrences concerning the incident alleged and the defendant's knowledge and understanding of the proceedings. 725 ILCS 5/104-16 (West 2014). Defendant's ability to learn, retain and discuss new information relates to defendant's ability to understand the proceedings and to defendant's ability to communicate with his attorney and assist with a defense that is available despite the defendant's amnesia, and therefore is relevant to the fitness determination. See *Schwartz*, 135 Ill. App. 3d at 640.

¶ 96    We note that based in part on the State's cross-examination of the defense's legal expert the State argued there were defenses available in spite of defendant's amnesia. Defendant has not provided any authority that the State must provide evidence as to every matter listed in the statute. It was for the trier of fact to weigh the conflicting evidence as to whether defendant was "fit." 725 ILCS 5/104-12 (West 2014) ("The defense or the State may demand a jury or the court on its own motion may order a jury."). The fact the State may have failed to elicit any testimony on an available point of consideration in the fitness determination goes to the weight of the State's evidence (but not its admissibility or sufficiency). 725 ILCS 5/104-16 (West 2014) ("*On the basis of the evidence before it*, the court or jury shall determine whether the defendant is fit to stand trial." (Emphasis added.)). Based on the record before us, a *Frye* hearing was not required.

¶ 97    We also find, for purposes of proceedings on remand, that the law is clear that defendant is entitled to a "meaningful" defense. A *bona fide* doubt of a defendant's fitness to stand trial necessitates a hearing. *People v. Hanson*, 212 Ill. 2d 212, 216 (2004) (citing 725 ILCS 5/104-

11(a) (West 2014)). "A *bona fide* doubt exists when the facts raise a real, substantial, and legitimate doubt regarding a defendant's mental capacity to *meaningfully* participate in his defense." (Emphasis added.) *People v. Schnoor*, 2019 IL App (4th) 170571, ¶¶ 44-45. See also *U.S. ex rel. Newman v. Rednour*, 917 F. Supp. 2d 765, 784 (N.D. Ill. 2012) (applying Illinois law and finding that "the evidence convincingly shows that [the defendant] was unable to provide 'meaningful assistance' to his attorney in his defense"). Further, "the Constitution guarantees criminal defendants a *meaningful* opportunity to present a complete defense." (Internal quotation marks omitted and emphasis added.) *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Any testimony or argument to the contrary is legally wrong and should not be allowed. However, we specifically decline to address whether the jury instructions should be modified to add "meaningfully." Defendant's only argument on appeal was that the State prejudiced defendant by attempting to diminish its burden of proof by arguing the jury did not have to find that defendant could assist his attorney with a meaningful defense. We hold only that the defense to which the defendant is entitled and to which the fitness statute refers is a "meaningful" defense.

¶ 98    Finally, without deciding the issue we note that the trial court was familiar with the evidence at defendant's murder trial and could competently rule as to whether the evidence from that trial was misstated. We decline to rule on these additional specific issues with the expectation the parties will conform their conduct to the requirements of this order. We again leave these and other matters for resolution in the first instance by the trial court, if necessary. See *Floyd*, 2019 IL App (1st) 160406, ¶ 57.

¶ 99    The erroneous instruction in this case was the State's instruction number nine, which stated that "Amnesia alone as to events surrounding the crime does not by itself render a person unfit to stand trial but should be considered by you together with all the other evidence." That

instruction is not an accurate statement of the law because amnesia alone *may*, by itself, render a person unfit to stand trial *if*, under the totality of the circumstances of the case, including where the defendant is charged with felony murder and accountability, the amnesia prevents the defendant from assisting in their own defense, for whatever reason. On remand, the trial court is instructed *not* to give the State's proffered nonpattern jury instruction.

¶ 100   The erroneous instruction prejudiced defendant, but the evidence was not sufficient to direct a verdict in defendant's favor. Accordingly, the judgment is reversed, and the cause remanded for a new retroactive fitness trial. We continue to retain jurisdiction, should defendant again be found retroactively fit to stand trial, to address any properly preserved contentions of error in defendant's conviction and sentence.

¶ 101                                   CONCLUSION

¶ 102   For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for proceedings consistent with this order; we retain jurisdiction over this appeal for all other issues properly raised.

¶ 103   Reversed in part and remanded with instructions, jurisdiction retained.